UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:09-CR-00040-BR-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | MEMORANDUM REGARDING |
| Plaintiff, ) | OBJECTIONS TO THE |
| ) | PRESENTENCE REPORT AND |
| vs. ) | MEMORANDUM IN OPPOSITION |
| ) | TO AN UPWARD DEPARTURE |
| PHILIP JOE GUYETT, JR. ) | |
| ) | |
| Defendant. ) | |

NOW COMES the Defendant, Philip Joe Guyett, Jr., by and through undersigned counsel, and submits the following Memorandum Objecting to Portions of the Presentence Report and Memorandum in Opposition to Government's Motion for Upward Departure. In support of this Memorandum, Mr. Guyett's position is set forth below.

I. **OBJECTIONS TO THE OFFENSE CONDUCT**

A. **Factual Objections Related to Tissue Recovery and Processing**

Mr. Guyett timely filed objections to the draft Presentence Report ("PSR") on June 23, 2009 attached as **Exhibit 1**. Summaries of some of the objections that were rejected by the Probation Office are attached to the Final Presentence Report as an Addendum. Mr. Guyett objected to numerous issues of fact regarding the offense conduct, namely the steps involving the processing of tissue (PSR ¶ 5); his role in the process being limited to preliminary screening and testing and the actual recovery of the tissue (not the screening, processing, storage and distribution before transplantation) (*Id.*); his reliance on the checks and balances in the following phases of tissue processing

and donation to recognize any errors or tissue that was inappropriate for donation because he was not trained or certified to determine donor suitability for transplant (*Id.*); and that Mr. Guyett's screening and testing alone was preliminary only and should not have been used in the ultimate determination of release of tissue grafts. Mr. Guyett provided documentation supporting those objections (**Exhibits A – L** attached to the June 23, 2009 letter).

The recovery or "retrieval" process involves several steps to be performed prior to and immediately after recovery which are outlined in the American Association of Tissue Banks' *Standards for Tissue Banking*. The process first requires that a staff member or director of the tissue bank, in this case Mr. Guyett, confirm that informed consent for donation has been given and documented (See AATB Standards attached hereto as **Exhibit 2**) and that the donor's identity be verified with the informed consent documentation. After informed consent and the identity of the donor have been verified, the donor is given an identification number so as to easily facilitate tracing of the tissue from the recovery phase up through the final disposition phase of the tissue donation process. Before the tissue can be recovered or retrieved, Mr. Guyett was responsible only for obtaining a medical or social history questionnaire from the next of kin of the donor along with conducting preliminary screening and testing by collecting blood samples from the donor to test for relevant communicable diseases (RADs). Once Mr. Guyett completed the preliminary screening and testing of the donor he would complete the recovery of the tissue and then quarantine and package the tissue according to AATB Standards (See **Exhibit 3**) immediately following the recovery of the tissue. Once he completed the recovery, packaging and quarantining of the tissue from the donor, the

2
Case 5:09-cr-00040-BR   Document 20   Filed 10/01/09   Page 2 of 18

tissue was required to be shipped to the processing center within the time frame required by the AATB Standards. *Id.* These steps in the recovery process are the only steps Mr. Guyett performed in the tissue donation process and they were the only steps Mr. Guyett was adequately trained to perform. Following the recovery and shipping of the tissue, there are four other phases, including determination of donor suitability, with a separate tissue processing center which employs medical directors and licensed, trained professionals to complete the subsequent steps of the donation process before the actual distribution and donation of the tissue. Mr. Guyett's company, Donor Referral Services (DRS), was only registered with the FDA as a tissue recovery service (See **Exhibit A**). Prior to release of cells and/or tissue for transplantation, the Medical Director or licensed physician designee at the tissue processing center shall determine donor suitability (See **Exhibit B**) and quality assurance and quality control reviews must be performed prior to release of tissue from the processing establishment (See **Exhibit 4**).

Additionally, Mr. Guyett objected to the Government's assertion that a donor who tests reactive for a particular relevant communicable disease (RAD), or who possesses clinical evidence of a risk factor, cannot be used for transplantation (PSR ¶ 5). The PSR also suggests that tissue from individuals who died of kidney, liver or lung cancer would not be suitable for transplant (PSR ¶ 10). While rejection due to cancer or RADs is common, medical records, hospital records, coroner's office records, certified death certificates and other relevant donor records would be necessary to make such a determination. Only the Medical Directors or licensed, trained designees of the processing establishments make determinations of donor suitability based on the relevant medical records (See **Exhibits B, C and 5**). Even so, the medical records necessary to

make determinations of donor suitability were not available to Mr. Guyett prior to recovery. Donors can be rejected for a number of medical conditions and the PSR fails to mention that the information for determining the suitability for transplant comes after the recovery process and was reviewed during the quarantine period, <u>after</u> Mr. Guyett no longer had possession of the recovered tissue and <u>after</u> the preliminary screening Mr. Guyett was required and able to perform. Once Mr. Guyett had conducted the preliminary screening of the donor with limited medical history information, non-certified death records and a medical social history questionnaire (provided by the processors) completed by a next of kin who may or may not have had knowledge of the donor's medical or social history, Mr. Guyett completed recovery of the tissue and shipped the tissue to the processors. The tissue would then be quarantined until a final determination of suitability for transplant is made. While in quarantine, the tissue must be identified as quarantined pending completion of donor-eligibility determination and must be labeled stating that the product must not be implanted, transplanted, infused or transferred until completion of the donor-eligibility determination (See **Exhibit 6**). Recovered tissue cannot move past the quarantine period until it has been fully screened by the Medical Director or other licensed individual (not Mr. Guyett) at the processing establishment who is authorized to perform designated functions for which he or she is trained and qualified to perform. *Id.* The process of determining final donor suitability can take up to months to be completed and the harvested tissue from donors can have a long shelf life. Per the AATB standards, tissue recovery must be performed within 12-24 hours after death (See **Exhibit 2**).

### B. Factual and Legal Objections Related to the Offense Behavior Not Part of Relevant Conduct

Mr. Guyett also has objected to donor records from Las Vegas, Nevada being included as "relevant conduct." (PSR ¶ 7). The time in which Mr. Guyett's company was registered in Las Vegas, Nevada was prior to the time frame set forth in the Criminal Information (March 2005 until December 2005) as well as outside the specific location set forth in the Criminal Information (Eastern District of North Carolina). The PSR specifically calls for two distinct sections: The Offense Conduct and The Offense Behavior Not Part of Relevant Conduct. Any actions by Mr. Guyett outside the scope of the March 2005 until December 2005 time frame should not be included as part of the Offense Conduct and rather, at most, should be included as part of the other Offense Behavior Not Part of Relevant Conduct and therefore should not be considered in the Guidelines calculations under U.S.S.G. § 1B1.3. Relevant conduct is necessarily limited to criminal conduct, and therefore the defendant's sentence cannot be based on defendant's noncriminal activities. U.S.S.G. § 1B1.3, Author's Discussion, § 1.

The Fourth Circuit has held that conduct which is not illegal cannot be relevant conduct. *United States v. Dove*, 247 F.3d 152, 2001 U.S. App. LEXIS 6257 (4th Cir. 2001) (reversing where defendant's sale of 118 black bear gall bladders did not violate Virginia law because it occurred outside the boundaries of Virginia jurisdiction, and holding that conduct which is not illegal cannot be relevant conduct). *See Also United States v. Culverhouse*, 507 F.3d 888, 2007 U.S. App. LEXIS 26134 (5th Cir. 2007). There has been no indication or suggestion by the Government that any conduct in Las Vegas, Nevada was criminal in nature. Mr. Guyett has admitted to falsifying the records of eight donors recovered by DRS and the recoveries of the eight donors for which Mr.

Guyett has accepted responsibility for were conducted here in North Carolina. The location for the recoveries of those eight donors has not been disputed.

## II. OBJECTIONS TO THE SENTENCING GUIDELINES CALCULATIONS

### A. Specific Offense Characteristics (Calculation of Amount of Loss) (PSR ¶35)

The conduct described in the Criminal Information and the Government's proffer of what its evidence at sentencing would show outlines a course of conduct relevant to a calculation of loss from 2004 through 2006 (PSR ¶ 13). However, the relevant conduct period set forth in the Criminal Information is from March 2005 through December 2005. Accordingly, this Court should only consider the bank records for Donor Referral Services with First Citizens Bank from March 2005 through December 2005 in determining total loss amount. Furthermore, this Court should only consider those deposits made to the bank account of Donor Referral Services that were a direct result of the monetary gain from the fraudulent conduct. Mr. Guyett made numerous deposits into the bank account of Donor Referral Services that were in no way related to the criminal conduct for which Mr. Guyett has pled guilty. A summary of the deposits made into the DRS bank account at First Citizens Bank from October 2004 (when DRS first began transacting business) through December 2005 (when DRS ceased conducting business and closed its doors) is attached hereto as **Exhibit K** and reflects each deposit made during the relevant conduct period and the source of the funds for each deposit.

The issue regarding the calculations on the amount of loss under the Federal Sentencing Guidelines is whether Mr. Guyett is responsible for the approximate amount of $391,293 that the Government alleges is the loss for the crimes that he committed (PSR ¶ 13) when only $28,000 was for the fraudulent transactions.

Mr. Guyett should not be held responsible for the total $391,293 that was deposited into his business' bank account. "Loss is the greater of actual loss or intended loss." Roger W. Haines, Jr., Frank O. Bowman, III & Jennifer C. Woll, *Federal Sentencing Guidelines Handbook* Ch. 2 § 2B1.1, cmt: n. 3(a) (2008-2009 ed., West 2008). "Actual loss is defined as 'reasonably foreseeable pecuniary harm that resulted from the offense' and intended loss is defined as 'the pecuniary harm that was intended to result from the offense' and includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* Pecuniary harm is defined as "harm that is monetary or that otherwise is readily measurable in money." *Id.* Reasonably foreseeable pecuniary harm is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*

When defining "the offense," the Guidelines originally had "language specifying that loss was harm resulting from conduct for which the defendant was accountable under the relevant conduct guideline, § 1B1.3." *Id.* at § 2B1.1, cmt: authors' discussion § 6. The most recent version of the Guidelines does not include that language, which is probably because "the drafters apparently felt that the cross reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types." *Id.*

Since the relevant conduct rules apply to § 2B1.1, it is again necessary to address what constitutes Mr. Guyett's relevant conduct. As mentioned above regarding the Offense Conduct, the Fourth Circuit has held that conduct which is not illegal cannot be relevant conduct. *United States v. Dove,* 247 F.3d 152, 2001 U.S. App. LEXIS 6257 (4th Cir. 2001) (reversing where defendant's sale of 118 black bear gall bladders did not violate Virginia law because it occurred outside the boundaries of Virginia jurisdiction,

and holding that conduct which is not illegal cannot be relevant conduct). The Fifth Circuit has also addressed the issue of relevant conduct being limited to conduct that is criminal. In *United States v. Schaefer,* the court vacated and remanded the defendant's sentence because the trial court failed to make explicit findings of fact related to relevant conduct and showing that all losses were the result of criminal conduct in the calculation of loss for sentencing purposes. *United States v. Schaefer,* 291 F.3d 932, 2002 U.S. App. LEXIS 9975 (7th Cir. 2002).

The attached summary shows revenues generated from legal conduct vs. revenues from "illegal conduct" (i.e. the cases where fraudulent information had been presented). (See **Exhibit K**). "Problems" with other cases of recoveries that may be the result of negligent or improperly documented (but not fraudulent) paperwork does not rise to the level of illegal and therefore relevant conduct. Revenues from legal conduct should not be included in the loss calculations. Any other actions, even if negligent, by Mr. Guyett other than falsifying the eight donor records he admitted to altering were not criminal, intentional, willful misconduct. Also, much of Mr. Guyett's income was derived outside the Eastern District of North Carolina for work performed outside the Eastern District of North Carolina and for these reasons, those revenues should not be considered relevant conduct.

Therefore, Mr. Guyett's amount of loss should only be limited to any harm that resulted from the offense and within the boundaries of North Carolina jurisdiction – only the fraudulent transactions which Mr. Guyett admitted to and only the transactions that were criminal in nature. The amount of loss from those transactions totals $28,000. Mr. Guyett should only be responsible for that amount. The remaining approximate amount

of $363,000 was money deposited from conduct which was not illegal and was not within this Court's jurisdiction and therefore cannot be relevant conduct.

**B.     Specific Offense Characteristics (Number of Victims) (PSR ¶ 36)**

The Government contends that the offense had at least 127 victims and therefore a four-level enhancement is warranted under the Guidelines. However, a four-level enhancement for the number of victims being more than 50 but less than 200 is unwarranted. The issue regarding the number of victims under the Federal Sentencing Guidelines requires first a determination of who are the actual victims of Mr. Guyett's conduct. The victims of Mr. Guyett's actions are the processors rather than the recipients of tissue recovered by Mr. Guyett relating to the relevant conduct.

It is first necessary to recognize the definition of a "victim." The commentary to § 2B1.1 provides that a "victim" is any person who either (a) "sustained any part of the actual loss determined under subsection (b)(1)"; or (b) "sustained bodily injury as a result of the offense." U.S.S.G § 2B1.1 cmt. n.1. Before addressing subsection (a) in detail below, it was Mr. Guyett's understanding based on the Government's represenations relevant to subsection (b), that there were no serious bodily injuries or deaths that have occurred as a result of Mr. Guyett's offense.

In addressing subsection (a) of the commentary to § 2B1.1, Mr. Guyett was not paid by recipients of the tissue recovered; he was paid by the processors with whom he had contractual agreements. Mr. Guyett did not have contractual agreements with any of the recipients and was not paid any money by the recipients. The actual loss sustained by Mr. Guyett's fraudulent conduct was the amount of money paid by the processors and which Mr. Guyett received and deposited to his business account ($28,000 for the

9

recovery of tissue from the 8 donors which Mr. Guyett has admitted to falsifying parts of several records). As noted above, "actual loss is defined as 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *Haines, supra.* Pecuniary harm is defined as "harm that is monetary or that otherwise is readily measurable in money." *Id., See Also United States v. Pham,* 545 F.3d 712, 716, 2008 U.S. App. LEXIS 20101, 8 (9th Cir. 2008) ("pecuniary harm" means "harm that is monetary or that otherwise is readily measureable in money" and "does not include emotional distress, harm to reputation, or other non-economic harm")(citing U.S.S.G. § 2B1.1cmt. n.3(A)(iii))(emphasis added).

It is further explained by the Third Circuit in *United States v. Kennedy* that "[i]f, as here, 'a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning'." *United States v. Kennedy,* 554 F.3d 415, 419, 2009 U.S. App. LEXIS 2120, 6 (3rd Cir. 2009). Section 2B1.1 of the Sentencing Guidelines does include an explicit definition of the terms "victim," "actual loss" and "pecuniary harm." When using each of these explicit definitions to determine the number of victims in Mr. Guyett's case, it is important to understand that the victims of the offense are directly related to the actual loss and the pecuniary harm. The Eleventh Circuit addresses this relationship specifically. The court states, "[t]he relevant commentary to the Guidelines defines a 'victim' as 'any person who sustained any part of the actual loss determined under subsection (b)(1). Accordingly, 'the number of victims is defined in relation to the loss calculation,' which in turn is the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *United States v. Ellisor,* 522 F.3d 1255, 1275, 2008 U.S. App. LEXIS 7374, 51 (11th Cir. 2008) citing *United States v. Foley,* 508 F.3d 627, 632 (11th Cir. 2007). *See also Pham, supra* at 723, 2008 U.S. App. LEXIS at

27 ("the government's case for imposing an enhancement for an offense involving fifty or more victims was not supported by a preponderance of the evidence showing that fifty or more victims suffered actual loss in the form of pecuniary harm"). The recipients of the tissue recovered by Mr. Guyett did not sustain any part of the actual loss amount; the actual loss amount being the $28,000 paid to Mr. Guyett by the processors for the tissue recovered as a result of the relevant conduct.

In determining actual loss, pecuniary harm and the number of victims directly related to the actual loss and pecuniary harm, it is also important to determine the valuation of loss which is discussed in the commentary of § 2B1.1. The Ninth Circuit in *Allison* states, "As in theft cases, loss is the <u>value of the money, property, or services unlawfully taken</u>...Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000." *United States v. Allison,* 86 F.3d 940, 942, 1996 U.S. App. LEXIS 15130, 5 (9th Cir. 1996)(emphasis added). The court goes on to say, "[t]he valuation of what was taken from the victim is important because 'it is an indicator of both the harm to the victim and the gain to the defendant'." *Id.* at 943, 1996 U.S. App. LEXIS at 6. As in *Allison,* by representing to the processors that the tissue he recovered was suitable for recovery (not suitable for donation) based on his altered documents submitted to the processors (documents he submitted as being "genuine"), the value of money taken from the processors by Mr. Guyett in making such representations was $28,000 which is an accurate reflection of the "harm to the victim" and the "gain to the [D]efendant."

As explained in detail above, Mr. Guyett was only responsible for the recovery phase of the tissue donation process. The recovery phase only involves obtaining informed consent documentation for the donation, verifying informed consent, conducting only preliminary screening and testing of the donor and then quarantining and packaging the tissue to ship to the tissue processing center, all required to be performed within 12-24 hours after death. There are multiple other individuals responsible for handling the recovered tissue once Mr. Guyett completed recovery and shipped the recovered tissue to the tissue processing center. Once out of Mr. Guyett's possession and during the quarantine period at the tissue processing center, the tissue still had to undergo rigorous screening, testing and sterilization and quality assurance and quality control reviews before a final determination of donor suitability could be determined. The only individuals trained and certified to make final suitability determinations were Medical Directors and other licensed physician designees within the tissue processing center. (See **Exhibits B, C and 5**) Tissue establishments (e.g. processors) determine final donor suitability. (See **Exhibit 7**) DRS was only registered with the Food and Drug Administration to perform recovery and Mr. Guyett was not qualified or certified to make final determinations nor did Mr. Guyett participate in any screening, testing and sterilization required before the tissue can ultimately be donated and transplanted to recipients.

C. **Specific Offense Characteristics (Conscious or Reckless Risk of Death or Serious Bodily Injury) (PSR ¶ 37)**

Mr. Guyett also objects to the enhancement pursuant to U.S.S.G. § 2B1.1(b)(13) regarding a conscious or reckless risk of death or serious bodily injury. Again, Mr. Guyett's responsibility was only to obtain informed consent documentation for the

donation, verify informed consent, conduct only preliminary screening and testing of the donor and then quarantine and package the tissue to ship to the tissue processing center, all required to be performed within 12-24 hours after death. Mr. Guyett did not transplant the tissue straight from the donor to the recipient. The tissue recovery screening, processing and distribution had in place significant screening and quality assurance procedures and subsequent processing should have reduced the potential risk of infectious diseases. The responsibility of making final determinations of donor suitability lies with the Medical Director of the tissue processing establishment (See **Exhibit 4**). Mr. Guyett relied on the system of checks and balances put in place in the following stages of tissue processing and donation to recognize any errors or tissue that was inappropriate and not suitable for donation. If tissue that was not suitable for transplant was in fact distributed even though it was not suitable, the responsibility lies with the Medical Director of the tissue processing establishment that is required to sign a Release/Disposition statement assuming responsibility for the donor suitability determination (See **Exhibit 5**).

If there has been any injury, there would have been, in legal terms, an intervening cause of misconduct that would have proximately caused such potential injury. That intervening misconduct was not reasonably foreseeable by Mr. Guyett as he assumed the "processors" were following their protocols to determine the eligibility and suitability for release of the tissues.

### D. Victim-Related Adjustments (PSR ¶ 38)

Section 3A1.1(b)(1) states that "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." However, under

*United States v. Anderson,* 349 F.3d 568, 2003 U.S. App. LEXIS 23231 (8th Cir. 2003), or alternatively, under U.S.S.G. § 2B1.1(b) cmt. n.4(b)(2)(D), no victim-related adjustment is warranted for vulnerable victims. Specifically, the application notes states, "If subsection (b)(2)(B) or (C) applies, and enhancement under § 3A1.1(b)(2) shall not apply." Even so, none of Mr. Guyett's victims were vulnerable victims. The victims of Mr. Guyett's criminal conduct are the processors that paid Mr. Guyett for the recovered tissue and sustained an actual loss incurred by Mr. Guyett's actions.

A "vulnerable victim" is defined as "a person who is a victim of the offense of conviction including relevant conduct, and who is unusually vulnerable due to age, physical or mental condition, or who is particularly susceptible to the criminal conduct." In *Anderson,* Anderson successfully argues that a vulnerable victim enhancement should not be upheld absent a finding of "particularized vulnerability." *Anderson* at 572, 2003 U.S. App. LEXIS at 7. The Eighth Circuit agreed with Anderson by stating "[o]ur early decisions applying *§ 3A1.1* support this contention, repeatedly stating that 'unless the criminal act is directed against the young, the aged, the handicapped, or unless the victim is chosen because of some unusual personal vulnerability, *§ 3A1.1* cannot be employed'." *Id.* (citations omitted). The court goes on to say, "[t]he inquiry…was to determine whether the defendant's choice of victims 'shows the extra measure of criminal depravity which *section 3A1.1* intends to punish more severly'." *Id.* citing *Paige,* 923 F.2d at 113-14. Mr. Guyett's criminal actions were not directed against anyone. Mr. Guyett was having financial problems with the business and needed to shut down the business which required him to get rid of the recovered tissue quickly. The processors that paid for and received the recovered tissue from Mr. Guyett could not have been unusually vulnerable

due to age, physical or mental condition nor were the processors chosen because of some unusual personal vulnerability. Mr. Guyett had no contractual obligations to anyone other than the processors. Mr. Guyett had no knowledge of the recipients that would be receiving the tissue which he recovered and shipped to the tissue processing establishments for further screening, testing and sterilization. Mr. Guyett had no knowledge as to what grafts would be made from the tissue he recovered. Mr. Guyett had no knowledge about the recovered tissue once he recovered the tissue and sent it to the processing centers that ultimately cleared tissue for transplant. Mr. Guyett could not have known the age, physical or mental condition of any recipients of the recovered tissue.

### E. Total Offense Level (PSR ¶ 44)

As set forth above, the Guidelines calculations include numerous adjustments outside the scope of the relevant, illegal conduct. A sentence within the Guideline range established by accepting Mr. Guyett's objections and the relevant case law supporting Mr. Guyett's objections would fully account for Mr. Guyett's illegal conduct and would be more reasonable. When recalculating the Guidelines calculations to include only a four-level enhancement for the total loss amount (more than $10,000 but less than $30,000), no enhancement for the number of victims finding that the actual victims were the processors and not the recipients (not involving 10 or more victims), and no enhancement for conscious or reckless risk of death or serious bodily injury, the adjusted offense level should be 11. After the adjustment to the offense level plus a 2-point reduction for acceptance of responsibility, the total offense level should be changed to 9 for a new Guideline range of 4 to 10 months.

15
Case 5:09-cr-00040-BR   Document 20   Filed 10/01/09   Page 15 of 18

### F. Objection to Upward Departure

Paragraph 58 of the PSR suggests that this Court may wish to consider an upward departure pursuant to U.S.S.G. §§ 5K2.3 and 5K2.0. Should the Court determine that Mr. Guyett's objections as stated and fully briefed above do not warrant any changes in the Guidelines calculations and now needs to consider a Motion for Upward Departure by the Government for extreme psychological damage to the recipients due to fear of possible infections, Mr. Guyett respectfully submits that the adjustments already in the Guidelines calculations reflected in the PSR already fully account for Mr. Guyett's actions for which he pled guilty and encompass the Court's determination that he should be held accountable for his criminal conduct. As such, the Guidelines range set forth in the PSR is reasonable and sufficient to achieve the goals of sentencing. Given the above adjustments for total loss amount, number of victims and conscious or reckless risk of death or serious bodily injury, reflected in the PSR even though those adjustments relate to matters outside the scope of the relevant conduct, Mr. Guyett respectfully submits that there is no need to also upwardly depart from the Guidelines range. The Guidelines calculations adequately take into consideration the criminal conduct of Mr. Guyett. Therefore, Mr. Guyett respectfully suggests that it is unnecessary and unreasonable for further increase in the Guidelines calculations because those calculations adequately account for Mr. Guyett's other conduct which, although outside the Criminal Information, are included in the PSR.

### III. CONCLUSION

Based on the reasons set forth above, Mr. Guyett respectfully requests that this Court find that the advisory Guideline range in this case is overstated and includes

enhancements that are not warranted because the factors for the enhancements suggested by the Government include conduct that was outside the relevant conduct period and was not included in the Criminal Information. Mr. Guyett also requests that this Court deny any Motion for Upward Departure because the Guidelines calculations set forth in the PSR already fully account for Mr. Guyett's actions for which he pled guilty and encompass the Court's determination that he should be held accountable for his criminal conduct and it is therefore unnecessary and unreasonable for further increase in the Guidelines calculations because those calculations adequately account for Mr. Guyett's criminal conduct.

Respectfully submitted, this the 1st day of October, 2009.

**Boyce & Isley, PLLC**

/s/ R. Daniel Boyce

R. Daniel Boyce
NC State Bar No. 12329
Post Office Box 1990
Raleigh, North Carolina 27602
Telephone: (919) 833.7373
Facsimile: (919) 833.7536
dboyce@boyceisley.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Memorandum Regarding Objections to the Presentence Report and Memorandum in Opposition to an Upward Departure* was filed with the clerk of court for the Eastern District of North Carolina using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record:

>Jason H. Cowley, Esq.
>Assistant United States Attorney
>Terry Sanford Federal Building
>310 New Bern Avenue
>Suite 800
>Raleigh, North Carolina 27601

This the 1st day of October, 2009.

**Boyce & Isley, PLLC**

/s/ R. Daniel Boyce

R. Daniel Boyce
NC State Bar No. 12329
Post Office Box 1990
Raleigh, North Carolina 27602
Telephone: (919) 833.7373
Facsimile: (919) 833.7536
dboyce@boyceisley.com