1          UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF NORTH CAROLINA
2                WESTERN DIVISION

3


4   UNITED STATES OF AMERICA,     )
                                  )
5                                 )
                    PLAINTIFF,    )
6                                 )
                                  )
7          VS                     ) CASE NO. 5:09-CR-40-1BR
                                  )
8                                 )
                                  )
9   PHILIP JOE GUYETT, JR.        )
                                  )
10                  DEFENDANT.    )

11

12

                        SENTENCING HEARING
13
                        OCTOBER 5, 2009
14
             HONORABLE W. EARL BRITT, PRESIDING
15

16

17  APPEARANCES:

18       MR. JASON COWLEY
         ASSISTANT UNITED STATES ATTORNEY
19       310 NEW BERN AVENUE
         RALEIGH, NC   27601
20       (FOR THE GOVERNMENT)

21       MR. R. DANIEL BOYCE
         BOYCE & ISLEY
22       ATTORNEYS AT LAW
         107 FAYETTEVILLE STREET
23       P. O. BOX 1990
         RALEIGH, NC   27602-1990
24       (FOR THE DEFENDANT)

25  SHARON K. KROEGER, COURT REPORTER
    MACHINE SHORTHAND REPORTER, COMPUTER AIDED TRANSCRIPTION

1                    I N D E X

2                   WITNESSES

3    NAME                                        PAGE

4    PHILIP JOE GUYETT, JR.

5        DIRECT EXAMINATION BY MR. BOYCE          4

6         CROSS EXAMINATION BY MR. COWLEY        21

7        REDIRECT EXAMINATION BY MR. BOYCE       31

8

9

10

11                   EXHIBITS

12   (FOR THE DEFT.)

13   NUMBER   DESCRIPTION              OFFERED   RECEIVED

14      8                                19        19

15      9                                19        19

16     10                                19        19

17      K

18

19

20

21

22

23

24

25

1          THE COURT:  ALL RIGHT.  THE COURT IS CALLING

2    FOR SENTENCING PHILIP JOE GUYETT, JR.

3          MR. BOYCE, HAVE YOU AND YOUR CLIENT RECEIVED

4    AND HAD AN OPPORTUNITY TO READ AND REVIEW THE PRESENTENCE

5    REPORT?

6          MR. BOYCE:  WE HAVE, YOUR HONOR.

7          THE COURT:  AND YOU HAVE NUMEROUS OBJECTIONS

8    AS SET FORTH IN THE ADDENDUM?

9          MR. BOYCE:  YES, SIR.

10         THE COURT:  LET YOUR CLIENT BE SWORN, PLEASE.

11         THE CLERK:  PLEASE STATE YOUR NAME, SIR.

12         THE DEFENDANT:  PHILIP JOE GUYETT, JR.

13         (WHEREUPON, THE DEFENDANT WAS SWORN.)

14         THE COURT:  MR. GUYETT, YOU HAVE HEARD YOUR

15   LAWYER TELL ME THAT YOU AND HE HAVE RECEIVED AND HAD AN

16   OPPORTUNITY TO READ AND REVIEW THIS PRESENTENCE REPORT;

17   IS THAT CORRECT?

18         THE DEFENDANT:  YES, SIR.

19         THE COURT:  ALL RIGHT.  YOU MAY HAVE A SEAT.

20   ALL RIGHT.  THE DEFENDANT'S FIRST OBJECTION IS TO

21   PARAGRAPHS 5, 10, 13 AND 34 OF THE PRESENTENCE REPORT

22   DEALING WITH THE AMOUNT OF LOSS ISSUE.

23         I HAVE CAREFULLY READ THE OBJECTION AND THE

24   PROBATION OFFICER'S RESPONSE, AND ALSO THE BRIEFS OF EACH

25   OF YOU PARTIES ON THE SUBJECT.

1          MR. BOYCE, I WOULD BE GLAD TO HEAR ANYTHING

2     FURTHER FROM YOU ON THAT.

3          MR. BOYCE:  THANK YOU, YOUR HONOR.  JUDGE,

4     WHAT I WAS GOING TO PROPOSE THAT WE DO IS THAT WE PUT MR.

5     GUYETT ON THE STAND TO EXPLAIN THE THREE OBJECTIONS.

6          THE COURT:  IF YOU WANT TO PUT ON ANY

7     EVIDENCE, THAT IS FINE WITH ME.

8          MR. BOYCE:  THANK YOU, JUDGE.  WE WOULD CALL

9     MR. GUYETT TO THE STAND.

10          PHILIP GUYETT, JR., THE DEFENDANT,
              CALLED AS A WITNESS, AND HAVING BEEN
11          FIRST DULY SWORN, ON HIS OATH, TESTIFIED AS
              FOLLOWS:

12

13    DIRECT EXAMINATION BY MR. BOYCE:

14    Q   MR. GUYETT, YOU HAVE REVIEWED THE PRESENCE REPORT

15    EARLIER; CORRECT?

16    A   YES.

17    Q   AND IN REVIEWING THE PRESENCE REPORT, WE FILED

18    SOME OBJECTIONS, SOME FIRST TO PARAGRAPHS 4 THROUGH 6

19    REGARDING THE PROCEDURES OF PROTOCOL; IS THAT RIGHT?

20    A   YES.

21    Q   DID YOU PREPARE A CHART TO HELP EXPLAIN YOUR

22    TESTIMONY REGARDING THE PROCEDURES AND PROTOCOLS?

23    A   YES, I DID.

24          MR. BOYCE:  MAY I APPROACH THE WITNESS, YOUR

25    HONOR?

1            THE COURT:  YES, YOU MAY.

2            MR. BOYCE:  YOUR HONOR, WE HAVE PROVIDED A

3    COPY OF THIS TO MR. COWLEY OF THE UNITED STATES

4    ATTORNEY'S OFFICE, MARKED IT AS EXHIBIT A.  I DON'T

5    BELIEVE IT'S MARKED IN THE EXHIBITS WE SENT YOU, BUT IT'S

6    A SUMMARY DOCUMENT OF SOME OF THE INFORMATION WE PROVIDED

7    YOU.

8    Q   MR. GUYETTE, COULD YOU WALK THROUGH YOUR CHART TO

9    EXPLAIN THE FOUR PHASES AND WHAT PHASE YOU WERE INVOLVED

10   IN, AND THEN CONTRAST THAT WITH YOUR UNDERSTANDING OF THE

11   SUBSEQUENT PHASES?

12   A   YES.  THE CHART WAS OBTAINED BY THE AMERICAN

13   ASSOCIATION OF TISSUE BANKS, AND THERE IS DIFFERENT

14   PHASES WITH REGARDS TO TISSUE DONATION.  THERE IS THE

15   CONSENT, THERE IS RECOVERY OF THE TISSUE, THERE IS THE

16   SCREENING AND TESTING, PROCESSING, DISTRIBUTION OF THE

17   TISSUE.

18   Q   THOSE ARE THE DIFFERENT PHASES?

19   A   YES.

20   Q   YOUR COMPANY WAS DONOR REFERRAL SERVICES; IS THAT

21   CORRECT?

22   A   YES, SIR.

23   Q   CAN YOU EXPLAIN TO THE COURT THE PHASES THAT YOU,

24   UNDER LAW, WERE ALLOWED TO PARTICIPATE IN, AND DESCRIBE

25   THEM USING EXHIBIT A, THE CHART?

1    A    OKAY.  I WAS REGISTERED WITH THE FDA AS A RECOVERY

2    SERVICE ONLY.  MY DUTIES OR WHAT I WAS ALLOWED TO DO AS A

3    RECOVERY SERVICE WAS TO OBTAIN CONSENT FROM THE DONOR'S

4    FAMILY AND THE RECOVERY OF THE TISSUE AFTER CONSENT.

5    Q    AND WERE YOU ALSO INVOLVED IN THE NEXT PHASE ON THE

6    CHART, RECOVERY PROCESS?

7    A    YES.

8    Q    CAN YOU EXPLAIN THAT?

9    A    THE RECOVERY PROCESS, IF I CAN JUST GO DOWN THE LINE

10   HERE, ONCE THE CONSENT IS GIVEN FOR DONATION, THE DONOR

11   IS CLEARED FOR RECOVERY PURPOSES.  AND WHAT WE DO AS A

12   RECOVERY SERVICE IS WE CONFIRM THE DONOR'S IDENTITY,

13   VERIFY THE CONSENT, AND LOOK AT THE TISSUES THAT HAVE

14   BEEN CONSENTED TO FOR RECOVERY.

15        WE ASSIGN THE DONOR AN IDENTIFICATION NUMBER THAT IS

16   UNIQUE FOR TRACKING PURPOSES.  WE DETERMINE IF THE

17   RECOVERY SITE IS SUITABLE AND IT'S NOT A SOURCE OF ANY

18   TYPE OF CONTAMINATION.  BLOOD SAMPLES ARE DRAWN FOR

19   TESTING.

20        WE ALSO PERFORM AN EXTERIOR BODY EXAMINATION AND

21   NOTE ANYTHING THAT -- ANY ANOMALIES OR TATTOOS OR

22   ANYTHING THAT COULD HELP IDENTIFY THE DONOR.

23        WE CONFIRM THE CRITICAL TIMES, WHICH MEANS THE TIME

24   OF DEATH, DATE OF DEATH, BECAUSE THERE ARE CERTAIN TIME

25   LIMITS THAT WE ARE GIVEN TO RECOVER TISSUE.

1        WE THEN START THE RECOVERY PROCESS WHICH IS DONE

2   UNDER ASEPTIC TECHNIQUES, WHICH MEANS IT'S SIMILAR TO

3   THAT OF AN OPERATION.  STERILE INSTRUMENTS ARE USED.  THE

4   BODY IS CLEANED.  THE RECOVERY TEAM IS GOWNED.  ALL OF

5   THE PRECAUTIONS ARE TAKEN TO MAKE SURE THAT EVERYTHING IS

6   DONE IN AN ASEPTIC FASHION.

7        ALONG WITH THE RECOVERY, EACH TISSUE IS CULTURED TO

8   MAKE SURE THAT THERE WAS NO INFECTION AND IF THERE IS ANY

9   TRACE OF BACTERIA, THAT THE PROCESSOR KNOWS WHAT TYPE OF

10  BACTERIA IT IS AND IF IT'S TREATABLE.

11       ONCE THE TISSUE IS RECOVERED, IT'S BAGGED IN STERILE

12  BAGS.  IT'S IDENTIFIED AND IT'S PLACED IN -- WELL, IT'S

13  PACKAGED AND IT'S SHIPPED TO THE PROCESSOR.  WHEN IT'S

14  SHIPPED, IT HAS TO BE SHIPPED UNDER QUARANTINE AND IT'S

15  -- AND THE QUARANTINE IS TO LET THE PROCESSOR KNOW AND

16  THE SHIPPING AGENCY KNOW THAT IT'S TISSUE, IT'S UNDER

17  QUARANTINE, AND IT IS NOT DEEMED SUITABLE FOR

18  TRANSPLANTATION AT THAT STAGE.

19  Q   WHEN YOU SAY NOT SUITABLE FOR TRANSPLANTATION AT THAT

20  STAGE; WHAT DO YOU MEAN?

21  A   WHEN WE DO A RECOVERY, WE GET LIMITED INFORMATION.

22  IT'S -- SINCE THE RECOVERIES WERE PERFORMED AT A FUNERAL

23  HOME, WE WEREN'T PRIVY TO THE HOSPITAL RECORDS OR

24  PHYSICIAN CHARTS OF ANY KIND, SO AT THAT STAGE, THERE IS

25  MORE DOCUMENTATION THAT IS NEEDED TO CLEAR THE DONOR

1   FOR -- TO BE A SUITABLE DONOR FOR TRANSPLANTATION, PLUS

2   IT TAKES TWO TO THREE DAYS TO GET BLOOD RESULTS AND MAY

3   TAKE A COUPLE OF WEEKS TO GET CULTURE RESULTS.

4        DEATH CERTIFICATES TAKES UP TO EIGHT DAYS.

5   Q   STOP THERE.  ARE YOU INVOLVED IN ANY PART OF THAT

6   PROCESS?

7   A   I AM NOT -- I WAS NOT INVOLVED IN OBTAINING DEATH

8   CERTIFICATES OR MEDICAL RECORDS.  I WAS NEVER -- THEY

9   WERE NEVER AVAILABLE TO ME.

10              MR. BOYCE:  MAY I APPROACH, YOUR HONOR?

11              THE COURT:  YES, YOU MAY.

12              MR. BOYCE:

13  Q   NOW, THE PRESENTENCE REPORT SUGGESTS THAT YOU WERE

14  RESPONSIBLE FOR FALSIFYING SOME CERTIFICATES OF DEATH.  I

15  SHOW YOU WHAT IS MARKED FOR IDENTIFICATION AS EXHIBIT 9.

16  CAN YOU EXPLAIN WHAT THAT IS AND HOW THAT IS DIFFERENT

17  FROM A CERTIFIED DEATH CERTIFICATE?

18  A   WHAT THE DOCUMENT IS -- AM I ALLOWED TO USE THE

19  FUNERAL HOME'S NAME?

20  Q   NO.

21  A   THE FUNERAL HOME THAT THE RECOVERIES WERE MADE AT,

22  THEY HAD A FORM THAT THEY USED IN ORDER TO GET APPROVAL

23  FOR CREMATION, AND IT WAS A XEROX COPY OF A BLANK DEATH

24  CERTIFICATE FORM AND THEY WOULD FILL IN CERTAIN

25  INFORMATION.

1         I AM NOT SURE WHAT WAS ALL REQUIRED BY THEM TO GET

2    APPROVAL FOR CREMATION, BUT IT WOULD -- IT WAS FILLED

3    OUT, SIGNED BY THE DOCTOR, AND I BELIEVE FAXED OVER TO

4    THE HEALTH DEPARTMENT.

5         AGAIN, I AM NOT SURE -- I AM ASSUMING IT WAS FAXED

6    OVER TO THE HEALTH DEPARTMENT, AND THEN THEY WERE GIVEN

7    APPROVAL FOR CREMATION.  IT WAS JUST, I GUESS, RELEASE --

8    RELEASE THE FUNERAL HOME SHOWING THAT THERE WAS NO

9    PENDING INVESTIGATION, I GUESS, FROM A CORONER'S OFFICE

10   AND THAT THE BODY COULD BE CREMATED.

11        AND THAT IS WHY IT WAS ALSO STAMPED ON THERE ON THE

12   FORMS, NOT ORIGINAL DEATH CERTIFICATE, FOR CREMATION

13   PURPOSES ONLY.

14        AND THE DIFFERENCE BETWEEN THIS AND A CERTIFIED

15   DEATH CERTIFICATE IS A CERTIFIED DEATH CERTIFICATE IS

16   COMPLETELY FILLED OUT.  THERE IS A REGISTER'S NUMBER.

17   IT'S, I GUESS, WATERMARKED OR IT'S ON A COUNTY

18   LETTERHEAD.

19   Q   NOW, YOU HAVE PLED GUILTY TO FALSIFYING ABOUT WHAT;

20   EIGHT RECORDS, IS THAT RIGHT?

21   A   YES.

22   Q   ALL RIGHT.  AND OTHER THAN THE FALSIFICATION OF THOSE

23   EIGHT RECORDS, DO YOU BELIEVE YOU COMPLIED WITH ALL THE

24   OTHER OBLIGATIONS OF THE RECOVERY PROCESS?

25   A   YES.

1    Q   SO YOUR PLEA TO THE FALSIFICATION OF RECORDS HAD TO

2    DO WITH SOME OF THE RECORDS THAT YOU FORWARD ON TO THE

3    PROCESSOR?

4    A   YES.

5    Q   AND TURN TO THE SECOND PAGE OF EXHIBIT A.  IS THIS

6    WHERE THE PROCESSOR TAKES OVER?

7    A   YES.

8    Q   ALL RIGHT.  DID YOU HAVE ANYTHING TO DO WITH THE

9    PROCESSING AS SET FORTH ON THE SECOND PAGE IN THE FIRST

10   BLOCK OF THAT PAGE?

11   A   NO.

12   Q   COULD YOU RUN THROUGH THAT AND EXPLAIN TO THE COURT

13   HOW ANYTHING WRONG, ANY CALLS ON THIS SECOND BLOCK, WOULD

14   CAUSE REJECTION OF THE TISSUE?

15           THE COURT:  WHAT IF HE HAS NOTHING TO DO WITH

16   THAT PART OF IT, MR. BOYCE?  HOW DOES HE KNOW?

17           MR. BOYCE:  I WILL REPHRASE THE QUESTION.

18   Q   IF -- YOU DIDN'T HAVE ANYTHING TO DO WITH THE

19   PROCESSING PHASE; CORRECT?

20   A   NO.

21   Q   AND DID YOU THINK THAT ANY OF THOSE CAUSES WOULD

22   CAUSE A TISSUE TO BE REJECTED?

23   A   IF I AM HEARING THE QUESTION CORRECTLY, TISSUE COULD

24   BE REJECTED FOR A NUMBER OF REASONS ALONG ANY OF THOSE,

25   ANY STEP.

1    Q    ANY OF THOSE STEPS IN THE SECOND BLOCK CALLED

2    SCREENING PERFORMED AT THE SCREEN ESTABLISHMENT PROCESS?

3    A    YES.

4    Q    AND GO DOWN TO THE NEXT ONE, TISSUE PROCESSING.

5    COULD THE TISSUE BE REJECTED DUE TO ANY PROBLEMS WITH ANY

6    OF THOSE FACTORS?

7    A    YES.

8    Q    ALL RIGHT.  WERE YOU INVOLVED IN ANY OF THE TISSUE

9    PROCESSING?

10   A    NO.

11   Q    AND FLIP OVER TO THE THIRD PAGE, ONE LAST ONE FOR

12   PROCESSING; IS THAT CORRECT?

13   A    YES.

14   Q    AND THEN THE FINAL BLOCK, RELEASE AND DISTRIBUTION.

15   COULD ANY PROBLEMS WITH THOSE FACTS OR STEPS ALSO CAUSE

16   THE TISSUE TO BE REJECTED?

17   A    YES.

18   Q    CAN YOU EXPLAIN TO THE COURT YOUR -- THE MISTAKE YOU

19   MADE IN ASSUMING THAT THE CHECKS AND PROCEDURES OR THE

20   PROTOCOLS THAT WOULD BE FOLLOWED IF THERE WAS A PROBLEM

21   WITH TISSUE, IT WOULD BE CAUGHT DOWN THE CHAIN OF EVENTS

22   OF THE PROTOCOL?

23   A    ONCE I WAS DONE WITH THE RECOVERY, AGAIN, THERE ARE

24   OTHER DOCUMENTS THAT ARE REQUIRED TO SCREEN A DONOR.  YOU

25   NEED A CERTIFIED DEATH CERTIFICATE.  YOU NEED MEDICAL

1    RECORDS.  YOU NEED PHYSICIAN REPORTS.  IF THE PERSON

2    PASSED AWAY AT THE HOSPITAL, THEY ARE REFERRED TO AS

3    THIRD PARTY RECORDS, AND TO WHERE ALL OF THE INFORMATION

4    JUST DOES NOT COME FROM ONE PERSON.

5         AND I DID NOT SUPPLY THOSE RECORDS TO THE PROCESSOR.

6    AND I DIDN'T HAVE POSSESSION.  IF I DID HAVE POSSESSION,

7    I WAS OBLIGATED TO FORWARD THOSE TO THE PROCESSORS.

8         ONCE THE PROCESSORS WOULD OBTAIN THAT INFORMATION,

9    JUST WITH THE DEATH CERTIFICATE ALONE, YOU COULD VERIFY

10   INFORMATION THAT WAS OBTAINED BY THE RECOVERY.  YOU CAN

11   VERIFY TIME OF DEATH, DATE OF DEATH, SOMETIMES SOMEONE

12   MAY JUST TELL ME WHEN THE PERSON WAS LAST SEEN ALIVE, BUT

13   THEN THE CORONER'S REPORT OR SOMETHING WOULD STATE

14   SOMETHING DIFFERENT, AND THAT IS ALL VERY IMPORTANT OR

15   CAUSE FOR REJECTION OF THE DONOR.

16        HOSPITAL RECORDS AND PHYSICIAN RECORDS COULD TELL

17   THE PROCESSOR OTHER MEDICATIONS THAT THE DONOR MAY HAVE

18   BEEN ON, OTHER MEDICAL CONDITIONS THAT THE DONOR MAY HAVE

19   HAD.

20        AND SO WITH THAT INFORMATION, IT WOULD HAVE CLEARED

21   -- IT WOULD HAVE CLEARED ANY DONOR THAT SHOULD HAVE BEEN

22   REJECTED.

23   Q   NOW, --

24             MR. COWLEY:  YOUR HONOR, FOR RECORD, I WOULD

25   OBJECT TO THAT CONCLUSION.  YOU CAN'T TESTIFY AS AN

1    EXPERT AS TO WHAT WOULD AND SHOULD AND COULD HAVE

2    HAPPENED HAD THE FINAL ARBITRATOR HAD ACCURATE

3    INFORMATION.

4              THE COURT:  I WILL CONSIDER THE SOURCE,

5    COUNSEL, AND YOU CAN ALSO ADDRESS IT ON

6    CROSS-EXAMINATION.

7              MR. BOYCE:

8    Q   WERE THOSE YOUR ASSUMPTIONS OF HOW THE PROTOCOLS

9    WORKED?

10   A   THAT IS -- IT'S -- I WON'T USE THE WORD "ASSUMPTION".

11   IT'S WHAT WAS REQUIRED BY THE AMERICAN ASSOCIATION OF

12   TISSUE BANKS AND THE FDA.

13   Q   NOW, IN PARAGRAPH 10 IT TALKS ABOUT HOW INVESTIGATORS

14   HAVING REVIEWED 100 DONOR RECORDS AND 37 OF THEM HAVING

15   PROBLEMS, AND I BELIEVE THERE IS A STATEMENT IN PARAGRAPH

16   12 THAT YOU ADMITTED THAT YOU FALSIFIED THE RECORDS OF

17   APPROXIMATELY 40 DONORS.

18            CAN YOU CLARIFY WHAT YOU MEANT BY THE 40 DONORS, HOW

19   THAT CONVERSATION WITH THE INVESTIGATING AGENT WENT?

20   A   YES.  WHEN THE FDA INVESTIGATORS VISITED ME AT MY

21   HOUSE IN AUGUST, IT WAS REVEALED TO ME THAT NONE OF THE

22   100 DONORS THAT I RECOVERED WERE EVER FULLY SCREENED.

23   Q   WHAT WAS YOUR REACTION TO THAT?

24   A   IT MADE ME SICK.

25   Q   WHY?

1    A    BECAUSE -- BECAUSE I HAD NO WAY OF ASSURING ANYONE

2    THAT -- THAT THE DONORS WERE CLEARED FOR ANYTHING.

3    EVERY -- THE DEATH CERTIFICATES AND THE MEDICAL RECORDS

4    NOT BEING OBTAINED AND THEN THE DONORS BEING PROCESSED

5    AND TRANSPLANTED, I -- IT MADE ME SICK.  IT MADE ME SICK

6    TO MY STOMACH.

7    Q    I BELIEVE THE AGENT SHOWED YOU EIGHT FILES THAT YOU

8    ACKNOWLEDGED WERE WRONG AND THAT YOU WERE RESPONSIBLE FOR

9    THE INCORRECT INFORMATION?

10   A    YES.

11   Q    ALL RIGHT.  THEN WHERE DOES THE NUMBER 40 COME FROM?

12   A    WHEN -- I BELIEVE IT WAS PAUL PEARCE. WHEN HE

13   REVEALED TO ME THAT -- THAT THE DONORS HAD NOT BEEN

14   SCREENED PROPERLY, HE ASKED ME IF I HAD ANY CLUE TO HOW

15   MANY DONORS MAY BE AT RISK, AND I TOLD HIM, I SAID, WELL,

16   YOU KNOW, WHEN I AM OBTAINING INFORMATION SOMETIMES FROM

17   FAMILIES, IT WAS VAGUE, IT WAS SUBJECTIVE, AND I WOULD

18   ESTIMATE THAT MAYBE 40 PERCENT OF THE DONORS DID NOT HAVE

19   OR THAT I DID NOT HAVE ALL OF THE INFORMATION THAT I

20   COULD HAVE HAD FROM ABOUT 40 PERCENT OF THE DONORS, SO

21   THAT IS WHAT I TOLD HIM, THAT I WOULD ESTIMATE THAT MANY

22   MAY BE AT RISK, JUST BECAUSE OF NOT HAVING THAT

23   INFORMATION.

24   Q    SO NOT THAT YOU FALSIFIED INFORMATION, BUT POSSIBLY

25   BECAUSE OF WHAT THE OTHER PEOPLE DIDN'T DO, FOLLOW THE

1    PROTOCOL LIKE THEY SHOULD HAVE, YOU COULDN'T VERIFY THE

2    INFORMATION THAT YOU THOUGHT WAS GOING TO BE VERIFIED

3    LATER?

4    A    RIGHT.  WHAT HAPPENS A LOT OF TIMES IS THE NEXT OF

5    KIN, THE NEXT OF KIN IS A GREAT SOURCE OF INFORMATION,

6    BUT THERE ARE OTHER SOURCES AS WELL, AND SO DURING THE

7    PROCESSING OR DURING THAT QUARANTINE PERIOD IS WHEN THOSE

8    OTHER SOURCES SHOULD BE DRAWN UPON TO KIND OF FILL IN THE

9    BLANKS.

10        AND SO, YES, I AM SORRY.  I FORGOT THE QUESTION NOW.

11   Q    LET ME JUST MOVE BACK.  WHAT PERIOD OF TIME DID YOU

12   HAVE TO COMPLETE WHAT YOU WERE SUPPOSED TO COMPLETE?

13   A    THERE IS A 24 HOUR -- THERE IS A 12 TO 24 HOUR TIME

14   WINDOW TO RECOVER TISSUE, AND MANY TIMES THE DONOR WAS

15   REFERRED TO MY COMPANY AFTER THE 12 HOURS, AND SO I HAD A

16   LIMITED AMOUNT OF TIME TO RECEIVE OR TO OBTAIN AS MUCH

17   INFORMATION AS I COULD, AND MANY TIMES, YOU KNOW, IT WAS

18   TWO HOURS, THREE HOURS, BEFORE THAT TIME EXPIRED.

19   Q    AND THEN IT WAS OUT OF YOUR HANDS?

20   A    YES.

21   Q    THEN IT WAS PASSED ON TO THE PROCESSOR?

22   A    YES.

23   Q    NOW, THE PRESENTENCE REPORT ALSO MENTIONS THAT YOU

24   HAD THE SAME BUSINESS IN LAS VEGAS, AND I BELIEVE THE

25   GOVERNMENT'S BRIEF SUGGESTS THERE WERE TWO INCIDENCES,

1    TWO LAS VEGAS CASES, THAT CAME UNDER SCRUTINY.  DO YOU

2    HAVE ANY RESPONSE TO THAT?

3    A    YES.  FROM WHAT I READ, THEY TALK ABOUT TWO CASES

4    THAT I THINK LATER THROUGH THEIR INVESTIGATION AND AFTER

5    THEY OBTAINED CERTIFIED DEATH CERTIFICATES SHOWED THAT

6    ONE OF THE DONORS HAD AN OPIATE HISTORY, AND I BELIEVE

7    ANOTHER DONOR HAD A CANCER HISTORY.

8        AND -- BUT DURING THE TIME OF THE INTERVIEW WITH THE

9    FAMILY, THAT INFORMATION WAS NOT RELATED TO ME.

10   Q    SO YOU DON'T -- TO YOUR RECOLLECTION, YOU DON'T

11   REMEMBER FALSIFYING ANY DOCUMENTS YOU MAY HAVE HAD IN LAS

12   VEGAS?

13   A    NO.

14   Q    DID YOU PREPARE A MONETARY LOSS CHART IN REFERENCE TO

15   PARAGRAPH 13 OF THE PRESENTENCE REPORT?

16   A    YES, SIR.

17              MR. BOYCE:  MAY I APPROACH, YOUR HONOR?

18              THE COURT:  YES, YOUR MAY.

19              MR. BOYCE:  YOUR HONOR, WE HAVE PROVIDED TO

20   THE GOVERNMENT EXHIBIT K, AND I BELIEVE YOU HAVE THAT

21   ALSO, BUT I HAVE A COLOR CODED VERSION, IF YOU DO NOT

22   HAVE IT.

23              THE COURT:  HAND ME UP WHATEVER YOU WANT TO.

24              MR. BOYCE:

25   Q    MR. GUYETT, CAN YOU EXPLAIN WHAT THIS COLOR CODED

1    CHART SHOWS?

2    A    IT SHOWS DEPOSITS THAT WERE MADE TO MY BUSINESS

3    ACCOUNT AT FIRST CITIZENS BANK.

4    Q    ALL RIGHT.  JUST QUICKLY GO THROUGH ON THE SECOND

5    PAGE, THE COLOR CODING, AND WHAT THE RESULTS OF YOUR

6    CALCULATIONS SHOW?

7    A    CORRECT ME IF I AM WRONG.  IF IT'S -- WHAT IS COLOR

8    CODED IN GRAY, IS THAT WHAT YOU WANT ME TO GO THROUGH?

9    Q    YES.

10   A    THE AREAS THAT ARE IN GRAY ARE DEPOSITS THAT WERE

11   MADE PRIOR TO MARCH 1 OF 2005.

12   Q    IS THAT WHEN YOU WERE IN LAS VEGAS?

13   A    THOSE WERE DONORS THAT WERE RECOVERED.  THE MAJORITY

14   OF THE DONORS WERE RECOVERED IN LAS VEGAS, YES.

15   Q    ALL RIGHT.  KEEP MOVING.

16   A    THE COLOR CODE BELOW, BLUE, I WILL CALL IT, IS

17   LABELED RELEVANT CONDUCT PERIOD, WHICH WERE DEPOSITS MADE

18   BETWEEN MARCH 1 AND THE END OF DECEMBER OF 2005.

19   Q    ARE THOSE DEPOSITS MADE INTO THE BUSINESS ACCOUNT?

20   A    YES.

21   Q    AND THEN ARE THEY FURTHER BROKEN DOWN?

22   A    YES, THEY ARE.  THE ONES IN GREEN ARE FROM DEPOSITS

23   THAT WERE MADE FROM DONORS, FROM DONOR RECORDS THAT WERE

24   ALTERED.

25   Q    AND ARE THERE EIGHT OF THOSE?

1    A    THERE ARE FOUR OF THOSE.

2    Q    OKAY.  LOOK ON THE SECOND PAGE.  THERE IS ANOTHER SET

3    OF FOUR IN GREEN.

4    A    OH, YES.

5    Q    THAT IS AN ADDITIONAL FOUR.

6    A    I AM SORRY.  I HAVE ONE ON THE FIRST PAGE.

7    Q    RIGHT.

8    A    THREE ON THE SECOND PAGE?

9    Q    RIGHT.  AND THEN ONE MORE BLOCK AT THE BOTTOM.

10   A    YES.  I SEE.

11   Q    SO THAT THE TOTAL IS $28,000?

12   A    YES.

13   Q    AND YOU ACKNOWLEDGE YOU WERE GUILTY OF HAVING

14   FALSIFIED THOSE?

15   A    YES.

16   Q    AND THAT IS HOW MUCH YOU RECEIVED IN PAYMENT FOR

17   THOSE TISSUES?

18   A    YES, SIR.

19   Q    ALL RIGHT.  AND HOW ABOUT IN THE ORANGE COLOR.  WHAT

20   ARE THOSE?

21   A    THE ORANGE REPRESENTS TRANSFERS FROM PERSONAL ACCOUNT

22   TO A BUSINESS ACCOUNT AND JUST PERSONAL CHECKS THAT I HAD

23   WROTE TO MYSELF TO KIND OF KEEP THE BUSINESS RUNNING.

24   Q    SO THOSE ARE LIKE CAPITAL CONTRIBUTIONS YOU MADE TO

25   YOUR OWN BUSINESS?

1    A   YES, SIR.

2    Q   I THINK THAT IS IT.

3              MR. BOYCE:  YOUR HONOR, WE WOULD MOVE INTO

4    EXHIBITS 8 AND 9, AND I BELIEVE 10 AND K IF IT HAS NOT

5    ALREADY BEEN ACCEPTED.

6              THE COURT:  THEY WILL BE RECEIVED.

7              MR. BOYCE:

8    Q   NOW MR. GUYETT, DO YOU BELIEVE YOU WERE TRUTHFUL WITH

9    THE AGENTS WHEN YOU TALKED WITH THEM?

10   A   YES.

11   Q   AND IN THE PRESENTENCE REPORT ON PARAGRAPH 14, YOU

12   GAVE A SOMEWHAT LENGTHY ACCEPTANCE OF RESPONSIBILITY AND

13   EXPRESSING DEEPLY REGRET FOR YOUR WRONGDOING AND

14   APOLOGIZING FOR ANY PROBLEMS?

15   A   YES.

16   Q   WHY DID YOU DO WHAT YOU DID?

17   A   IN AROUND APRIL OR MAY OF 2005, ONE OF THE CONTRACTS

18   THAT I HAD WITH THE PROCESSOR HAD CALLED ME UP AND TOLD

19   ME THAT THEY HAD -- THEY WERE HAVING PROBLEMS WITH ONE OF

20   THEIR SUBCONTRACT -- SUBCONTRACT PROCESSORS, AND IF I

21   WOULDN'T MIND HOLDING THE DONORS THAT THEY WERE ACCEPTING

22   AT MY FACILITY UNTIL THEY SOLVED THOSE PROBLEMS.

23        I INFORMED THEM THAT I DIDN'T REALLY HAVE THE RIGHT

24   FREEZERS AND THE EQUIPMENT TO DO THAT WORK, BUT I DID

25   AGREE TO DO IT.

1        AT THE -- DURING THE SAME TIME WHERE MY BUSINESS WAS

2   -- IT WAS FAILING NOT BECAUSE OF WORK, BUT JUST -- I WAS

3   JUST IGNORANT AND UNPREPARED FOR WHAT IT TAKES TO RUN

4   SUCH A COMPANY, AND WASN'T PREPARED FOR THE COST OF

5   RUNNING SUCH A COMPANY.

6        AND WHEN I WAS HOLDING THE TISSUE FOR THE PROCESSOR,

7   DAYS TURNED INTO WEEKS, AND WEEKS TURNED INTO MONTHS, AND

8   I WAS STARTING THE PROCESS OF CLOSING MY BUSINESS.

9        I NEEDED TO GET RID OF THAT TISSUE, AND I WAS LEFT

10  WITH A DECISION THAT I DIDN'T LIKE TO HAVE TO MAKE.  HOW

11  DO I GET RID OF THE TISSUE IN A LEGAL, ETHICAL WAY, OR

12  HOW AM I GOING TO STORE TISSUE WHEN I AM NO LONGER IN

13  BUSINESS.

14       SO WHAT I DID IS I CHANGED SOME INFORMATION ON SOME

15  OF THE DONOR CHARTS AND SENT THEM TO TWO OTHER

16  PROCESSORS.  AND MY INTENT WAS NOT TO STEAL FROM ANYONE

17  OR HURT ANYONE.  IT WAS JUST TO GET THEM OUT OF MY

18  POSSESSION, AND I -- I GUESS WRONGLY ASSUMED -- BUT I WAS

19  HOPING THAT ONCE THE SCREENING PROCESS FOLLOWED THROUGH

20  THAT THE OBVIOUS CHANGES THAT I MADE WOULD PUT UP A RED

21  FLAG AND THE DONORS THAT SHOULD BE REJECTED ARE REJECTED.

22  ANY OF THEM THAT COULD BE USED, COULD BE USED FOR

23  RESEARCH AND WHAT HAVE YOU.  IT WAS A DUMB DECISION.  BUT

24  IT'S THE DECISION THAT I MADE.

25           MR. BOYCE:  THANK YOU, SIR.  YOUR HONOR, THAT

1    IS THE ONLY EVIDENCE WE HAVE AT THIS TIME.  HE WOULD LIKE

2    TO RESERVE HIS RIGHT FOR ALLOCUTION.

3             THE COURT:  I UNDERSTAND THAT.  NOW, I WAS

4    ONLY CONSIDERING WHEN WE STARTED THIS THE FIRST FACTUAL

5    OBJECTION.  NOW, IF YOU ARE GOING TO QUESTION HIM ABOUT

6    ANY OF THE OTHER OBJECTIONS YOU HAVE GOT ON THIS, YOU

7    NEED TO DO THAT NOW.

8             MR. BOYCE:  I TRIED TO HANDLE ANYTHING AND

9    EVERYTHING AT ONE TIME, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

11             MR. COWLEY:  THANK YOU.

12   CROSS-EXAMINATION BY MR. COWLEY:

13   Q   LET'S CLEAR A FEW THINGS UP, MR. GUYETT.  YOU PLEAD

14   GUILTY TO ENGAGING IN A SCHEME TO DEFRAUD OTHERS BY

15   TELLING FALSE STATEMENTS; ISN'T THAT CORRECT?

16   A   YES.

17   Q   AND ONE OF THE LAST THINGS YOU SAID IS THAT YOU JUST

18   FALSIFIED INFORMATION ON A FEW FORMS; IS THAT CORRECT?

19   A   YES.

20   Q   THAT IS THE CRIME YOU ARE SAYING YOU PLED GUILTY TO

21   TODAY?

22   A   YES.

23   Q   BUT YOU ARE AWARE, SIR, UNDER THE CRIMINAL

24   INFORMATION TO WHICH YOU PLEAD GUILTY, IT ALSO LAYS OUT

25   HOW AS PART OF THE SCHEME -- AND I AM QUOTING HERE -- YOU

1    WOULD (QUOTE) "RESUBMIT FOR SALE TISSUE UNDER A FALSE

2    DONOR NAME THAT HAD PREVIOUSLY BEEN REJECTED FOR PURCHASE

3    UNDER THE ACTUAL DONOR'S NAME".

4        DO YOU RECALL THAT?

5    A    I DON'T RECALL ANY FALSE DONOR NAME.

6    Q    SO IS IT YOUR STATEMENT NOW THAT YOU ARE DISAGREEING

7    WITH THINGS THAT YOU PLED GUILTY TO IN A CRIMINAL

8    INFORMATION?

9    A    I DON'T KNOW WHAT I AM AGREEING TO.  I KNOW THAT I

10   PLED GUILTY TO -- TO A SCHEME AND THE SCHEME THAT I WAS

11   PLEADING GUILTY TO WAS REGARDING THE EIGHT DONORS THAT I

12   KNOW I WRONGLY ALTERED.

13   Q    AND DO YOU RECALL THE DISCUSSION ON THE CRIMINAL

14   INFORMATION ABOUT SUBMITTING FALSE BLOOD SAMPLES?

15   A    I KNOW THAT THERE WERE A FEW CASES WHERE BLOOD

16   RESULTS DID NOT MATCH AND MY PLEA AT THE TIME WAS THE

17   PERSON THAT WAS HANDLING THOSE, BUT SINCE IT HAPPENED AT

18   MY BUSINESS, I TAKE FULL RESPONSIBILITY OF THAT.

19   Q    SO DESPITE THIS BEING IN THE CRIMINAL INFORMATION YOU

20   PLEADED GUILTY TO, I AM GOING TO CLARIFY, ARE YOU NOW

21   SAYING THAT YOU DID NOT PARTICIPATE IN SUBMITTING FALSE

22   BLOOD SAMPLES, SIR?

23   A    IF IT CAME FROM MY BUSINESS, I AM PLEADING GUILTY TO

24   THAT, YES.

25   Q    IN FACT, DO YOU RECALL, SIR, SUBMITTING BLOOD SAMPLES

1    FOR TISSUE FROM DONORS THAT HAD HEPATITIS, SUBMITTING

2    BLOOD SAMPLES FROM OTHER DONORS TO ENSURE THAT THAT

3    TISSUE WAS COLLECTED FROM TISSUE BANKS FROM YOU?

4    A   YES.

5    Q   SO THAT IS IN ADDITION TO JUST FALSIFYING THINGS ON

6    MEDICAL HISTORY REPORTS; ISN'T IT?

7    A   YES.  THAT WAS ONE SPECIFIC DONOR.

8    Q   AND THIS WASN'T A SITUATION WHERE YOU JUST SORT OF

9    RAN OUT OF TIME TO GET THE FULL STORY ON WHY SOMEONE

10   DIED; IS THAT CORRECT?

11   A   AFTER I PERFORMED THE RECOVERY, I DID NOT OBTAIN ANY

12   OTHER INFORMATION BECAUSE I WAS NOT --

13   Q   YOU KNEW THAT DONOR HAD HEPATITIS C, BUT YOU

14   SUBMITTED SOMEBODY ELSE'S BLOOD SAMPLE WITH THAT TISSUE;

15   DIDN'T YOU, SIR?

16   A   I KNEW THAT WHEN THAT DONOR PASSED AWAY, THAT DONOR

17   HAD HEPATITIS.  IT WAS AFTER THE BLOOD RESULTS CAME BACK

18   THAT IT SHOWED THAT IT WAS HEPATITIS C.

19   Q   YOU SUBMITTED BLOOD SAMPLES FROM ANOTHER DONOR, SIR;

20   DIDN'T YOU?

21   A   YES.

22   Q   NOW, LET'S TALK ABOUT THIS CHART THAT YOU ALL

23   DISCUSSED REGARDING THE RECOVERY PROCESS.  NOW, IT'S

24   ULTIMATELY, IF I UNDERSTOOD YOU RIGHT, YOU WERE HOPEFUL

25   THAT PEOPLE DOWN THE LINE WERE GOING TO DETECT YOUR FALSE

1    STATEMENTS; IS THAT MY UNDERSTANDING?

2    A    WITH THOSE EIGHT DONORS, YES.

3    Q    AND THAT IT WAS NOT YOUR RESPONSIBILITY TO MAKE A

4    DETERMINATION AS TO WHETHER OR NOT TISSUE WAS ACCEPTABLE;

5    IS THAT RIGHT?

6    A    IT WAS NOT MY RESPONSIBILITY TO DEEM A DONOR ELIGIBLE

7    FOR TRANSPLANTS.

8    Q    WELL, LET'S TALK ABOUT THAT PROCESS A LITTLE BIT THAT

9    IS LAID OUT.  IN TERMS OF VERIFYING CONSENT FROM THE

10   DONOR OR THE DONOR'S FAMILY, THAT WOULD BE PART OF YOUR

11   RESPONSIBILITIES; RIGHT?

12   A    YES.

13   Q    WOULD YOU ADMIT THAT IF YOU ARE TELLING DONORS'

14   FAMILIES THAT THEIR DECEASED LOVED ONES TISSUES WILL BE

15   USED FOR RESEARCH WHEN, IN FACT, IT WAS GOING TO BE USED

16   FOR IMPLANTATION IN OTHER PEOPLE, THAT WOULD BE IN

17   VIOLATION OF THE FDA REGULATIONS IN TERMS OF HOW ONE

18   OBTAINS CONSENT?

19   A    I DON'T KNOW WHICH DONOR THAT YOU ARE TALKING ABOUT,

20   AND THERE WERE CASES WHERE SINCE I WAS RECOVERING TISSUE

21   FOR RESEARCH FACILITIES AS WELL, ONE OF THEM BEING THE

22   NATIONAL CANCER INSTITUTE, THERE WERE TIMES WHERE THE

23   FAMILY WOULD CONSENT TO BOTH.

24   Q    SITTING HERE TODAY, DO YOU ADMIT OR DENY THAT YOU

25   LIED TO DONORS' FAMILIES TO OBTAIN CONSENT TO HARVEST

1    TISSUE, SIR?

2    A    I DID NOT LIE TO DONORS' FAMILIES.

3    Q    AND YOU READ SOME OF THE LETTERS SUBMITTED AS

4    EXHIBITS, SIR, FROM DONORS' FAMILIES --

5    A    YES.

6    Q    -- THAT TALK ABOUT HOW YOU COULD OBTAIN THEIR CONSENT

7    BY SAYING IT WAS FOR RESEARCH?

8    A    YES, I DID.

9    Q    ARE YOU AWARE, SIR, THAT TISSUES FROM THOSE

10   INDIVIDUALS WERE SENT BY YOU TO LOST MOUNTAIN TISSUE BANK

11   FOR PROCESSING AND IMPLANTATION IN OTHERS?

12   A    YES.

13   Q    NOW, LET'S TALK ABOUT SOME OTHER STEPS OF THE

14   RECOVERY PROCESS THAT YOU SAY IT WASN'T YOUR JOB TO MAKE

15   A FINAL CALL ON WHETHER OR NOT TISSUE SHOULD BE

16   HARVESTED, BUT YOU DID HAVE SOME RESPONSIBILITIES UNDER

17   FDA REGULATIONS; DIDN'T YOU?

18   A    YES.

19   Q    IN FACT, YOU HAD SOME CONTRACTUAL RESPONSIBILITIES AS

20   WELL; ISN'T THAT RIGHT?

21   A    YES.

22   Q    AND PART OF THOSE RESPONSIBILITIES WERE TO ASSURE

23   THAT THE RECOVERY IS DONE IN ACCORDANCE WITH FDA, AATB,

24   AND USTC STANDARDS AND POLICIES; IS THAT RIGHT?

25   A    I BELIEVE IT WAS THE AATB AND THE FDA.  I DON'T

1    REMEMBER THE OTHER STANDARDS.

2    Q    AND SOME OF THE CONTRACTUAL OBLIGATIONS ALSO INCLUDED

3    DOCUMENTATION OF INFORMED CONSENT AND COPIES OF THE

4    LABORATORY TESTING RESULTS THAT YOU HAD PERFORMED; IS

5    THAT RIGHT?

6    A    YES.  I WAS CONTRACTED TO SEND RESULTS FROM THE

7    LABORATORIES WHEN THEY WERE DONE UNDER MY -- WHEN I PAID

8    FOR IT, I WOULD GET THE RESULTS AND THEN THEY WOULD BE

9    PASSED ON, PLUS EVERY PROCESSOR HAD ACCESS TO THE

10   LABORATORY FILE OR THE PASSWORDS SO THEY COULD LOOK AT IT

11   THEMSELVES, TOO.

12   Q    AS WE WERE DISCUSSING EARLIER, YOU ENGINEERED FALSE

13   OUTCOMES FROM SOME OF THE LAB REPORTS BY SUBMITTING FALSE

14   OR BLOOD SAMPLES FROM ANOTHER DONOR; DIDN'T YOU?

15   A    YES, ON THAT ONE; YES.

16   Q    AND THIS WOULD BE THE TYPES OF THINGS THAT DONOR OR

17   THAT PROCESSORS DOWN THE LINE WOULD UTILIZE TO MAKE A

18   FINAL DECISION AS TO WHETHER OR NOT A TISSUE WAS SUITABLE

19   FOR IMPLANTATION; WOULDN'T IT?

20   A    IT'S ONE PIECE, YES.

21   Q    IT'S ONE PIECE.  AND THE MEDICAL HISTORIES THAT YOU

22   WOULD PROVIDE TO THEM WOULD BE ANOTHER PIECE; WOULDN'T

23   THEY?

24   A    YES.

25   Q    AND THE -- ANY INFORMATION YOU COULD DERIVE FROM THE

1    NEXT OF KIN REGARDING A DONOR'S MEDICAL HISTORY AND

2    BEHAVIORS DURING LIFE THAT COULD BE RISK FACTORS, ET

3    CETERA, THIS WOULD ALSO BE ANOTHER FACTOR THAT THEY WOULD

4    RELY UPON WHEN THEY WOULD BE MAKING THESE ASSESSMENTS;

5    WOULDN'T IT?

6    A    YES.

7    Q    NOW, WE TALKED A LITTLE ABOUT YOUR CONDUCT IN LAS

8    VEGAS, AND YOU SAID THAT IN REGARDS TO ONE DONOR IN

9    PARTICULAR WHO DIED OF A METHADONE OVERDOSE IN A HOTEL

10   ROOM IN LAS VEGAS, THAT THIS WAS NOT INFORMATION THAT YOU

11   HAD AT THE TIME?

12   A    CORRECT.

13   Q    IS IT YOUR TESTIMONY TODAY, SIR, THAT THE DONOR'S

14   FAMILY LIED TO YOU ABOUT THAT?

15   A    NO, I DON'T THINK ANY DONOR'S FAMILY LIED TO ME.

16   Q    SO WHEN YOU WROTE DOWN IN THE MEDICAL HISTORY FOR

17   THAT INDIVIDUAL THAT HE DIED AT HOME OF UNKNOWN CAUSES,

18   WHERE WAS THAT -- WHERE WAS THAT INFORMATION COMING FROM?

19   A    THAT INFORMATION -- I DON'T REMEMBER IN THE FORMAT OF

20   THE FORMS.  I DON'T BELIEVE THE FAMILY IS EVER ASKED HOW

21   THE DONOR DIED.  THAT INFORMATION CAME FROM THE FUNERAL

22   HOME, THE TRANSPORT DRIVER, BECAUSE IT WOULD -- ON THE

23   CHART, IT WOULD ASK WHAT THE CAUSE OF DEATH WAS AND THEN

24   THE SOURCE OF THAT, AND THAT INFORMATION NORMALLY CAME

25   FROM THE FUNERAL HOME.

1          BUT IF ANYTHING WAS TO EVER CHANGE, YOU CAN CHANGE

2     THAT.  YOU CAN, YOU KNOW, FROM DRAWING A LINE THROUGH IT,

3     INITIALING IT, OR DATING IT, ANY TYPE OF CHANGE OF

4     INFORMATION, SO THE CAUSE OF DEATH INFORMATION CAME FROM

5     THE FUNERAL HOME.

6     Q    AND IN TERMS OF INDIVIDUALS WHO DIED OF CANCER IN LAS

7     VEGAS, ARE YOU AWARE, SIR, IT WASN'T JUST ONE INDIVIDUAL

8     THAT DIED OF CANCER IN LAS VEGAS WHOSE TISSUE YOU

9     RECOVERED.  IT WAS APPROXIMATELY 13 OR 14 BY MY COUNT

10    THAT IS REFERENCED IN MS. WESTLY'S FDA REPORT.  ARE YOU

11    AWARE OF THAT?

12    A    I AM AWARE OF THAT NOW, YES.

13    Q    IT'S YOUR TESTIMONY THAT FOR ALL OF THESE, EVERY

14    SINGLE ONE OF THEM, THAT INFORMATION THAT THEY HAD CANCER

15    SIMPLY WASN'T AVAILABLE TO YOU AT THE TIME?

16    A    THE MEDICAL SOCIAL HISTORY FORM THAT YOU ARE TALKING

17    ABOUT IS A FORM THAT IS PROVIDED BY THE PROCESSOR.  IN

18    THE STANDARD OPERATING PROCEDURES FROM THE PROCESSOR

19    RELATING TO THAT FORM, I WAS ASKED BY THE PROCESSORS TO

20    START THAT PROCESS.

21          AND THEIR SOP STATE THAT THE ANSWERS HAVE TO BE

22    EITHER "YES" OR "NO", BUT ANY ANSWER OTHER THAN A "YES"

23    IS CONSIDERED A "NO".  BUT THAT -- THAT SAME FORM SHOULD

24    BE SHOULD BE USED AS WELL TO INTERVIEW THE PRIMARY CARE

25    PHYSICIAN, ANY OTHER FAMILY MEMBERS THAT MAY KNOW MORE OF

1  THE BEHAVIORAL HISTORY, OR MEDICAL HISTORY, SO THE FORM

2  THAT I DID FILL OUT, IT WAS PRELIMINARY AND COULD ALWAYS

3  BE ADDED TO BY OTHERS.

4  Q   THE BOTTOM LINE IS ALL THOSE DONORS HAD CANCER, SIR,

5  AND ON THAT FARM YOU MARKED "NO" FOR EVERY SINGLE ONE?

6  A   YES.

7  Q   NOW, THE FDA FOUND SOME OTHER VIOLATIONS IN REGARDS

8  TO DONOR REFERRAL SERVICES.  DO YOU RECALL THAT?

9  A   YES.

10 Q   DO YOU RECALL THAT YOU WERE FOUND IN VIOLATION OF

11 GUIDELINES FOR FAILING TO MAINTAIN PROTOCOLS FOR THE

12 TESTING AND SCREENING OF TISSUE?

13 A   WHEN THE FDA CAME TO PERFORM THE AUDIT IN, I BELIEVE

14 IT WAS JUNE, JUNE OR JULY, I FORGET -- I THINK THE END OF

15 JUNE, THEY CAME TO MY OFFICE WHICH WAS A NEW -- IT WAS A

16 NEW OFFICE.  I WAS NOT INVOLVED IN TISSUE BANKING

17 ANYMORE.

18 Q   SIR, IT'S A "YES" OR "NO" QUESTION.

19 A   WELL, YES, THEY FOUND ME IN VIOLATION BECAUSE I

20 DIDN'T HAVE ANYTHING ANYMORE AT MY OFFICE.  I DIDN'T HAVE

21 ANYTHING FOR THEM TO INSPECT.

22 Q   AND IT'S ALSO TRUE THAT THEY FOUND THAT YOU HAD

23 FAILED TO ESTABLISH, MAINTAIN AND FOLLOW APPROPRIATE

24 PROCEDURES FOR THE TISSUE COLLECTING STEPS THAT YOU

25 PERFORMED?  DO YOU RECALL THAT?

1    A    YES, BECAUSE I NO LONGER HAD THEM IN MY POSSESSION.

2    Q    AND DO YOU ALSO RECALL THAT THEY FOUND YOU IN

3    VIOLATION FOR FAILING TO ESTABLISH, MAINTAIN, AND FOLLOW

4    STANDARD OPERATING PROCEDURES TO INSURE THAT RECOVERY OF

5    THE TISSUE TOOK PLACE IN A SUITABLE ENVIRONMENT THAT

6    WOULD NOT CAUSE CONTAMINATION OR CROSS-CONTAMINATION

7    DURING RECOVERY OR INCREASE THE RISK OR SPREAD OF

8    DISEASE?

9    A    YES.  I DID NOT HAVE THOSE RECORDS DURING THE AUDIT.

10   Q    AND YOU HAD THOSE RECORDS NOT STORED ANYWHERE; IS

11   THAT CORRECT?

12   A    I HAD LIMITED RECORDS ON MY COMPUTER.

13   Q    ARE YOU AWARE, SIR, THAT THE MAINTENANCE OF THOSE

14   RECORDS SOMETIMES CAN BE ESSENTIAL FOR GOING BACK AND

15   FOLLOWING UP TO TRY TO DETERMINE IF TISSUE IS SUITABLE

16   FOR IMPLANTATION?

17   A    YES.  MANY OF THE RECORDS WERE SENT TO THE -- BACK TO

18   THE PROCESSOR.  ANYONE WHO SUPPLIED ME WITH EQUIPMENT,

19   THOSE LOGS WERE SENT BACK TO THE PROCESSOR.

20   Q    YOU UNDERSTAND THAT YOU WERE IN VIOLATION OF FDA

21   REGULATIONS BY FAILING TO MAINTAIN THOSE RECORDS

22   YOURSELF; DON'T YOU?

23   A    THAT DAY, YES.

24   Q    AND YOU ALSO UNDERSTAND THAT WAS A VIOLATION OF

25   ASSURANCES THAT THEY WERE MAKING TO THE TISSUE BANKS THAT

1    YOU WERE GOING TO ABIDE BY ALL GOVERNING FDA REGULATIONS;

2    WEREN'T YOU?

3    A    YES, REGARDING RECORDKEEPING.

4    Q    AND WHEN YOUR CRIMINAL SCHEME CAME TO LIGHT, SIR, ARE

5    YOU AWARE THAT THE TISSUES THAT WERE RECALLED WASN'T JUST

6    FOR THESE EIGHT INDIVIDUALS YOU SAY THE SCHEME WAS

7    LIMITED TO; IS THAT RIGHT?

8    A    I AM SORRY.

9    Q    THAT WHEN YOUR CRIMINAL SCHEME WAS DETECTED, THAT THE

10   RECALL OF THE TISSUE AT ISSUE WASN'T JUST FOR THE EIGHT

11   INDIVIDUALS THAT YOU SAY YOU TOLD LIES ABOUT.  IT WAS FOR

12   EVERY SINGLE TISSUE YOU HARVESTED; WASN'T IT?

13   A    YES.  WHEN THE FDA --

14   Q    IT'S A "YES" OR "NO" QUESTION.

15   A    YES.  I WAS TOLD TO RECALL ALL THE DONORS.

16             MR. COWLEY:  NOTHING FURTHER.

17             THE COURT:  ANYTHING FURTHER, MR. BOYCE?

18             MR. BOYCE:

19   REDIRECT EXAMINATION BY MR. BOYCE:

20   Q    DO YOU NEED TO EXPLAIN YOUR ANSWER?  YOU ARE ENTITLED

21   TO EXPLAIN THE ANSWER.

22   A    WHEN THE FDA CAME TO PERFORM THE AUDIT AT MY NEW

23   BUSINESS, I DIDN'T HAVE ANY RECORDS OR I HAD VERY FEW

24   RECORDS LEFT OF DONOR REFERRAL SERVICES.  IT WAS

25   SUGGESTED TO ME BY THE FDA BACK IN NOVEMBER OR DECEMBER

1   OF 2005 TO FORWARD ANY RECORDS THAT I DID HAVE TO THE

2   PROCESSORS THAT RECEIVED THE DONORS.

3       WHEN THE AUDIT WAS PERFORMED, I TALKED TO A PERSON

4   FROM THE FDA IN ATLANTA AND HE HAD SUGGESTED THAT I FILE

5   A LETTER RECALLING ALL OF THE DONORS BASED ON INADEQUATE

6   DONOR SCREENING.

7           MR. BOYCE:  THANK YOU.  NO OTHER QUESTIONS,

8   YOUR HONOR.

9           THE COURT:  YOU MAY STEP DOWN.  DO YOU HAVE

10  OTHER EVIDENCE?

11          MR. BOYCE:  NO, YOUR HONOR.

12          THE COURT:  DO YOU HAVE ANY EVIDENCE ON THIS

13  ISSUE?

14          MR. COWLEY:  NO, SIR.  ONLY ARGUMENT.

15          THE COURT:  NOW WE ARE GOING BACK TO OBJECTION

16  NUMBER ONE IN THE ADDENDUM, AND SPECIFICALLY, NOW, MR.

17  BOYCE, TO THE AMOUNT OF LOSS.  BECAUSE THAT IS THE ONLY

18  THING IN THE OBJECTION THAT AFFECTS THE GUIDELINE

19  CALCULATIONS AS FAR AS I UNDERSTAND IT.

20          MR. BOYCE:  OKAY, YOUR HONOR.  IN OUR

21  SENTENCING MEMO, WHAT WE TRIED TO DO, AGAIN, WAS EXPLAIN

22  WHAT HIS RESPONSIBILITIES WERE AND THE TIMEFRAME OF THE

23  CONDUCT --

24          THE COURT:  I UNDERSTAND THAT.

25          MR. BOYCE:  -- LEADING UP TO THE EIGHT CASES

1   THAT WE ARE TALKING ABOUT.

2           ON THE CALCULATION OF AMOUNT OF LOSS ISSUED, I

3   BELIEVE THE CALCULATIONS AT EXHIBIT 35, WHAT WE HAVE

4   TENDERED TO THE COURT NOW IS THE CALCULATIONS BASED ON

5   THE EIGHT PARTICULAR CASES.  AND WE CITED SOME CASES IN

6   OUR BRIEF ABOUT PECUNIARY HARM THAT WAS INTENDED TO

7   RESULT FROM THE OFFENSE AND INCLUDES INTENDED PECUNIARY

8   HARM THAT WOULD BE IMPOSSIBLE OR UNLIKELY TO OCCUR.

9           ON PAGE 8 OF OUR BRIEF, WE TALK ABOUT THE

10  LEGAL CONDUCT VERSUS REVENUES FROM ILLEGAL CONDUCT AND

11  STATE THAT PROBLEMS WITH OTHER CASES OF RECOVERIES THAT

12  MAY BE THE RESULT OF NEGLIGENTLY OR IMPROPERLY

13  DOCUMENTED, BUT NOT FRAUDULENT PAPERWORK, DOES NOT RISE

14  TO THE LEVEL OF ILLEGAL AND THEREFORE RELEVANT CONDUCT.

15          YOUR HONOR, WHAT WE REALIZED IN THE

16  GOVERNMENT'S CALCULATIONS WAS THEY JUST TOOK A NUMBER

17  THAT SHOWED ALL THE MONEY THAT MAY HAVE FLOWED INTO THE

18  BUSINESS DSR WHICH WAS OWNED BY MR. GUYETT, AND AS THE

19  CHART SETS OUT, A SIGNIFICANT PORTION WAS BACK IN VEGAS.

20  THAT IS IN GRAY.

21          THERE ARE A NUMBER OF CHECKS, SOME TOTALING AS

22  MUCH AS $7,000 IN WHICH MR. GUYETT WAS ATTEMPTING TO KEEP

23  HIS BUSINESS AFLOAT BY MAKING WHAT I CALL CAPITAL

24  CONTRIBUTIONS.

25          AND THEN IN THE BLUE, THOSE ARE ALL THE OTHER

1   CASES IN THE RELEVANT CONDUCT PERIOD AS SET FORTH IN THE

2   CRIMINAL INFORMATION.

3           SO THAT ONLY LEAVES THE BLOCK OF GREEN CHECKS

4   THAT HE ACTUALLY RECEIVED ON THE DONOR TISSUES THAT HE

5   HAS ACKNOWLEDGED WERE FRAUDULENT.

6           YOUR HONOR, AGAIN, I UNDERSTAND WHAT THE

7   GOVERNMENT IS ARGUING HERE.  THIS -- AND IT DOES NOT TAKE

8   AWAY IN ANY WAY MR. GUYETT'S REMORSE AND HORROR WHEN HE

9   FOUND OUT WHAT HE DID, BUT FROM A LEGAL POINT OF VIEW, AS

10  WE STEP THROUGH IT, WE THOUGHT WE SHOULD BE MAKING THAT

11  NOTED TO THE COURT.

12          THE COURT:  MR. COWLEY.

13          MR. COWLEY:  THANK YOU, YOUR HONOR.

14          YOUR HONOR, TO BEGIN, EVEN TAKING OUT ALL OF

15  THE ENTRIES THAT YOU SEE THAT ARE PERSONAL CHECKS OR

16  DESIGNATED FOR RESEARCH AND THE LIKE, THAT AMOUNTS --

17  THAT AMOUNT IS APPROXIMATELY $83,000.  YOU REMOVE THAT

18  FROM THE TOTAL AND SO YOU JUST HAVE ISOLATED INCOME

19  COMING IN FROM HIS SALE OF TISSUE AND YOU ARE STILL AT

20  $308,323, YOUR HONOR.

21          SO EVEN EXCLUDING ALL THAT, YOU ARE STILL IN

22  THE SAME GUIDELINES LOSS AMOUNT ENHANCEMENT.  SO IT COMES

23  DOWN TO, I BELIEVE, TWO LEGAL ARGUMENTS THAT HE MAKES.

24  ONE IS WHETHER OR NOT IT SHOULD BE LIMITED TO THE EIGHT

25  DONORS IN QUESTION THAT HE SAYS IS THE LIMITATION OF THE

1    SCHEME; AND SECONDLY, WHETHER OR NOT TISSUE HARVESTED IN

2    LAS VEGAS AS OPPOSED TO RALEIGH SHOULD OR SHOULD NOT BE

3    INCLUDED IN THIS SCHEME.

4             WE THINK THAT ALL THE TISSUE PROCEEDS SHOULD

5    BE INCLUDED AS RELATED CRIMINAL CONDUCT FOR A FEW

6    REASONS, YOUR HONOR.  ONE, STARTING WITH THE LAS VEGAS

7    ISSUES, AS EXHIBIT 1 TO THE SENTENCING MEMORANDUM MAKES

8    CLEAR, THE WESTLY REPORT, THERE ARE FALSE STATEMENTS IN

9    DOCUMENTS FROM DONOR HARVESTING IN LAS VEGAS.  IT WAS NOT

10   JUST WHAT YOU HEARD TODAY ABOUT THE METHADONE ADDICT WHO

11   DIED IN THE HOTEL ROOM WHERE MR. GUYETT FALSELY WROTE

12   DOWN THAT HE DIED SOMEWHERE ELSE.

13            YOU ALSO HAVE AT LEAST 12 TO 13 INDIVIDUALS

14   THAT HAD EITHER CANCER OR DEMENTIA, AND MR. GUYETT IS

15   MARKING "NO" ON THE MEDICAL HISTORY SHEET THAT IS SENT ON

16   TO THE PROCESSORS AND UTILIZED WHEN THEY ARE MAKING A

17   FINAL DECISION AS TO THE WHETHER OR NOT THAT INDIVIDUAL'S

18   TISSUE CAN BE USED FOR HUMAN IMPLANTATION.

19            THOSE ARE ALL INDIVIDUALS THAT HE IS TELLING

20   FALSE STATEMENTS ABOUT THAT ARE FROM LAS VEGAS, YOUR

21   HONOR; NOT JUST NORTH CAROLINA.  SO IMPORTANTLY, WE THINK

22   IT'S ALL RELATED CRIMINAL CONDUCT.

23            NOW, THE NEXT QUESTION IS CAN YOU PARSE OUT

24   JUST THE FRAUDULENT TISSUE FROM THE PROCEEDS OF ALL

25   TISSUE.  WE WOULD SAY THAT WHILE THERE ARE SOME CASES IN

1    THE FOURTH CIRCUIT THAT YOU CAN MAKE THAT DISTINCTION.

2    ONE CASE THAT THE COURT I THINK HAS BEEN MADE AWARE OF

3    WAS IN THE TRAVEL VOUCHER CONTEXT WHERE YOU CAN EASILY

4    SORT OF PARSE OUT, YOU KNOW, THIS WAS FALSE STATEMENTS

5    ABOUT A TRAVEL VOUCHER.  THE MONEY FROM HERE IS INVALID.

6    BUT AGAIN, THESE WERE VALID TRAVEL VOUCHERS, SO THEY

7    SHOULD BE EXCLUDED.

8            BECAUSE OF THE HEAVILY REGULATED CONSUMER

9    PRODUCT INDUSTRY THAT IS THE HUMAN TISSUE INDUSTRY, YOUR

10   HONOR, THE CASE LAW IS VERY DIFFERENT.  AND SOME OF THE

11   CASES THAT WE CITED, THE GONZALEZ-ALVAREZ CASE, THE

12   RODNEY CASE, AND THE WEST CASE ARE ALL GOOD EXAMPLES OF

13   THAT THAT ARE MUCH MORE SPECIFIC.

14           AND ALSO EVIDENCING THIS IN THE CASE IS THE

15   FACT THAT RECALLS TOOK PLACE NOT JUST FOR THESE EIGHT

16   INDIVIDUAL DONORS THAT MR. GUYETT IS ALLEGING HIS SCHEME

17   IS LIMITED TO.  THE RECALL TOOK PLACE FOR EVERY SINGLE

18   TISSUE THAT MR. GUYETT HARVESTED.

19           BECAUSE THE BOTTOM LINE IS AS SOON AS HIS

20   CRIMINAL SCHEME WAS FOUND TO HAVE TAKEN PLACE, THE VALUE

21   OF ANY TISSUE HE HARVESTED WAS NONE.  IT WAS NOTHING.  NO

22   TISSUE BANK, NO HOSPITAL, NO DOCTOR, NO PATIENT WAS EVER

23   GOING TO UTILIZE ANY TISSUE FROM DONOR REFERRAL SERVICES

24   AGAIN.  AND THAT IS WHERE THE RECALL IS FROM.

25           AND BY THE WAY, I DON'T THINK IT'S AS CLEAR AS

1    THE TESTIMONY IS, IT'S NOT AS IF MR. GUYETT MADE THE

2    DECISION TO RECALL EVERYTHING.  THE TISSUE BANKS DECIDED

3    TO RECALL ALL TISSUES COMING FROM DONOR REFERRAL

4    SERVICES, AND THE FDA ISSUED A WARNING NOTIFICATION

5    REGARDING ALL TISSUE FROM DONOR REFERRAL SERVICES.

6         HIS CRIMINAL CONDUCT MADE THE VALUE OF ALL

7    TISSUE THAT HE HARVESTED ZERO, YOUR HONOR.  ZERO.  SO ALL

8    PROCEEDS SHOULD BE COUNTED IN THE LOSS AMOUNT.  THAT IS

9    ONE AVENUE AS TO WHY ALL THIS MONEY SHOULD BE INCLUDED IN

10   THE LOSS AMOUNT.

11        THERE IS ALSO ANOTHER INDEPENDENT AVENUE, TOO,

12   YOUR HONOR.  THE FDA ALSO FOUND IN ADDITION TO THESE

13   FALSE STATEMENTS THAT HE WAS MAKING THAT PROCEDURAL

14   VIOLATIONS WERE TAKING PLACE, THAT HE WAS NOT ENSURING

15   THAT THEY WERE HARVESTED -- THAT THE TISSUE THAT WAS

16   BEING TAKEN FROM DONORS IN A SECURE, STERILE ENVIRONMENT.

17   HE WAS MAINTAINING INADEQUATE PAPERWORK.  HE WAS

18   MAINTAINING INADEQUATE PROCESSES TO MAKE SURE THAT THIS

19   TISSUE WAS GOING TO BE SAFE.

20        NOW, I WOULD BE THE FIRST TO ADMIT THAT THAT

21   IS A REGULATORY VIOLATION.  THAT IS NOT A CRIMINAL

22   VIOLATION.  AND THERE IS AN ARGUMENT THERE THAT THAT CAN

23   BE MADE ABOUT CRIMINAL CONDUCT, BUT IT BECOMES CRIMINAL

24   IN THAT HE IS ASSURING THE WORLD THROUGH CONTRACT,

25   THROUGH REPRESENTATIONS AND THE LIKE, THAT HE IS ABIDING

1    BY FDA REGULATIONS IN HIS PROCUREMENT OF THESE TISSUES.

2    AND HE IS NOT.  HE IS LYING ABOUT IT FROM THE BEGINNING

3    OF THE PROCESS TO THE END, THAT HE IS INVOLVED IN IT.

4         FOR THOSE TWO INDEPENDENT AVENUES OF

5    REASONING, WE THINK BOTH ARRIVE AT THE SAME CONCLUSION

6    AND IS SUPPORTED BY CASE LAW THAT ALL PROCEEDS TAKEN FROM

7    HIS HARVESTING OF TISSUE CONSTITUTE LOSS BECAUSE OF THIS

8    CRIMINAL SCHEME, YOUR HONOR.

9         THE COURT:  ALL RIGHT.

10         THE COURT HOLDS THAT THE LOSS IS -- INCLUDES

11    THE PROCEEDS FROM ALL TISSUE THAT WAS HARVESTED.  AND

12    EVEN IF THE COURT WERE TO EXCLUDE THE MATTERS SHOWING

13    PERSONAL CHECKS AND TRANSFERS OF THAT NATURE, IT WOULD

14    STILL NOT AFFECT THE SPECIFIC OFFENSE CHARACTERISTIC THAT

15    IS ADDRESSED IN THE OBJECTION.  SO THAT OBJECTION IS

16    THEREFORE OVERRULED.

17         OBJECTION 2 IS DIRECTED TOWARDS PARAGRAPH 15

18    WITH REGARD TO THE NUMBER OF VICTIMS IN THE CASE.

19    PARAGRAPHS 15 AND 36 -- 36 STATES THAT THE OFFENSE

20    INVOLVED 127 VICTIMS, A FOUR LEVEL INCREASE IS WARRANTED

21    BECAUSE THE OFFENSE INVOLVED MORE THAN 50, BUT LESS THAN

22    200 VICTIMS.

23         MR. BOYCE, DO YOU WANT TO BE HEARD FURTHER ON

24    THAT OBJECTION?

25         MR. BOYCE:  I DON'T THINK SO OTHER THAN

```
 1    POINTING OUT AND SAYING THAT IN THE BRIEF, STARTING AT
 2    PAGE 9, AGAIN, THAT IS NOT TO SAY THAT ANYBODY WHO
 3    RECEIVED THE TISSUE AND HAD TO GO GET CHECKED.  AGAIN,
 4    MR. GUYETT WAS AS HORRIFIED AND REMORSEFUL ABOUT THAT.
 5              BUT I WAS LOOKING AT THE LEGAL DEFINITIONS OF
 6    "VICTIM" AS PURSUANT TO 2B1.1 REGARDING, AGAIN, LEGAL
 7    DEFINITIONS OF PECUNIARY HARM MEANS HARM THAT IS MONETARY
 8    AND IS OTHERWISE REVENUE MEASURABLE AND DOES NOT INCLUDE
 9    EMOTIONAL DISTRESS, HARM TO REPUTATION OR OTHER
10    NON-ECONOMIC HARM.  AGAIN, YOUR HONOR, THAT IS JUST A
11    LEGAL ARGUMENT.
12              THE COURT:  WELL, THE OBJECTION IS OVERRULED.
13              THE THIRD OBJECTION IS TO PARAGRAPH 37 WHICH
14    ASSIGNS TWO POINTS FOR SPECIFIC OFFENSE CHARACTERISTIC IN
15    THAT THE OFFENSE INVOLVED A CONSCIOUS OR RECKLESS RISK OF
16    DEATH OR SERIOUS BODILY INJURY.  A TWO LEVEL INCREASE IS
17    WARRANTED PURSUANT TO 2B1.1B(13).
18              DO YOU WANT TO BE HEARD ON THAT, MR. BOYCE?
19              MR. BOYCE:  YOUR HONOR, THAT IS IN PARAGRAPH
20    12 OF OUR BRIEF.  WE DO NOT WISH TO BE HEARD FURTHER
21    OTHER THAN POINTING OUT, AGAIN, WHAT HE HAS ACKNOWLEDGED,
22    IS HE STUPIDLY ASSUMED THAT THE CHECKS AND BALANCES OF
23    THE PROCESSORS AND DISTRIBUTORS WOULD TAKE CARE AND WEED
24    OUT IF THERE WERE ANY PROBLEMS, BUT HE ACKNOWLEDGES THAT
25    WAS A STUPID MISTAKE ON HIS PART.
```

1           THE COURT:  THAT OBJECTION IS OVERRULED.

2   PARAGRAPH 4, OBJECTION 4 ON THE -- IS DIRECTED TOWARDS

3   PARAGRAPH 38.  TWO LEVEL INCREASE AS TO THE VICTIM, KNEW

4   OR SHOULD HAVE KNOWN THAT THE VICTIMS OF THE OFFENSE WERE

5   VULNERABLE, TWO LEVELS WERE ADDED.  DO YOU WANT TO BE

6   HEARD?

7           MR. BOYCE:  THAT IS PARAGRAPH 13 OF OUR BRIEF,

8   YOUR HONOR.  IT'S, AGAIN, A LEGAL DEFINITION OF

9   VULNERABLE VICTIM.  AND WE CITED THE ANDERSON CASE FROM

10  THE EIGHTH CIRCUIT THAT SAYS UNLESS A CRIMINAL ACT IS

11  DIRECTED AGAINST THE YOUNG AGED OR HANDICAP OR UNLESS THE

12  VICTIM IS CHOSEN BECAUSE OF SOME UNUSUAL VERSION OF

13  VULNERABILITY, 3A1.1 CANNOT BE EMPLOYED.

14          THE COURT:  WELL, I LIKE THE PROBATION

15  OFFICER'S RESPONSE TO THAT OBJECTION.  SECTION 3A1.1

16  APPLICATION NOTE 2 DEFINES A VULNERABLE VICTIM TO BE A

17  PERSON WHO THE VICTIM OF THE OFFENSE OF CONVICTION,

18  INCLUDING RELEVANT CONDUCT, AND WHO IS UNUSUALLY

19  VULNERABLE DUE TO AGE, PHYSICAL OR MENTAL CONDITION, OR

20  WHO IS PARTICULARLY SUSCEPTIBLE TO CRIMINAL CONDUCT.

21          THE DEFENDANT INTENTIONALLY FALSIFIED RECORDS

22  RELATING TO THE HARVESTING OF TISSUE WHICH WOULD HAVE NOT

23  OTHERWISE BEEN ACCEPTED FOR TRANSPLANTATION.  THE

24  DEFENDANT KNEW THE TISSUE WAS GOING TO BE USED FOR

25  TRANSPLANTATION IN HUMAN PATIENTS.  A PATIENT UNDERGOING

1    A CRITICAL MEDICAL PROCEDURE REQUIRING TRANSPLANTATION OF

2    DONOR TISSUE IS PARTICULARLY VULNERABLE TO THIS TYPE OF

3    OFFENSE.

4              THAT OBJECTION IS OVERRULED.  ALL RIGHT.

5              ALL RIGHT.  THE OBJECTION NUMBER 5 TOWARDS

6    PARAGRAPH 16, OF COURSE, IS AN CALCULATION, I TAKE IT --

7    NO, NO.  THAT IS NOT.  THAT IS A CONVICTION THAT YOU

8    CONTEND WAS EXPUNGED, MR. BOYCE.  DO YOU WANT TO BE HEARD

9    FURTHER ON THAT?

10             MR. BOYCE:  I DON'T BELIEVE SO BECAUSE I THINK

11   IT'S JUST A ONE LEVEL.  IT WAS DISMISSED AND EXPUNGED,

12   BUT I DON'T KNOW THAT IT CHANGES THE GUIDELINE

13   CALCULATIONS.  I DON'T NEED TO BE HEARD FURTHER.

14             THE COURT:  ALL RIGHT.  THAT OBJECTION IS

15   OVERRULED.

16             OBJECTION TO PARAGRAPH 58 IS -- WILL BE

17   ADDRESSED SEPARATELY BY THE GOVERNMENT'S MOTION FOR A

18   DEPARTURE.

19             THEREFORE, THE COURT HAVING RULED ON ALL THE

20   OBJECTIONS, AND HAVING OVERRULED ALL OF THEM, DETERMINES

21   AND ADOPTS THE FACTUAL FINDINGS AND GUIDELINE APPLICATION

22   IN THE PRESENTENCE REPORT, AND DETERMINES THAT THE TOTAL

23   OFFENSE LEVEL IS 24, CRIMINAL HISTORY CATEGORY IS I.

24             THE CUSTODY RANGE IS 51 TO 63 MONTHS.

25   SUPERVISED RELEASE RANGE IS TWO TO THREE YEARS.  FINE

1    RANGE IS $10,000 TO $100,000.  RESTITUTION IS A MATTER TO

2    BE DETERMINED.  SPECIAL ASSESSMENT IS $300.   ALL RIGHT.

3            WE HAVE -- THE COURT HAS MOTIONS FOR VARIANCE

4    AND DEPARTURE ON BOTH SIDES; ONE BY THE DEFENDANT AND ONE

5    BY THE GOVERNMENT.

6            MR. COWLEY:  YOUR HONOR, I WOULD ALSO LIKE TO

7    NOTE WE DO HAVE SOME VICTIMS THAT ARE PRESENT THAT ARE

8    INTERESTED IN ALLOCUTING AT WHATEVER TIME THE COURT FEELS

9    IS APPROPRIATE.

10           THE COURT:  WELL, I NORMALLY WOULD TAKE --

11   WELL, I BELIEVE IT WOULD BE A GOOD TIME TO HEAR THEM NOW

12   BEFORE WE HEAR THE MOTIONS.

13           MR. COWLEY:  THANK YOU, SIR.

14           THE COURT:  CAN YOU MOVE HER DOWN A LITTLE BIT

15   WHERE SHE IS NOT HIDDEN BY THAT SCREEN THERE.  I WOULD

16   LIKE TO SEE THE LADY WHEN SHE IS TALKING TO ME.

17           MR. COWLEY:  IS THAT BETTER, YOUR HONOR?

18           THE COURT:  I DON'T KNOW.  I CAN'T SEE THROUGH

19   THE AGENTS NOW.

20           THE AGENT:  I AM SORRY, YOUR HONOR.

21           THE COURT:  OKAY.

22           THE AGENT:  THANK YOU, YOUR HONOR.

23           MR. COWLEY:  YOUR HONOR, THIS IS MS. BETTY

24   OGLETREE.

25           THE COURT:  MS. OGLETREE, I WOULD BE GLAD TO

1    HEAR FROM YOU, MA'AM.

2              MS. OGLETREE:  MY NAME IS BETTY OGLETREE.  I

3    LIVE IN FORT BATTLE, GEORGIA.  I HAD SURGERY OCTOBER 17

4    OF 2004.  IN ABOUT FIVE DAYS AFTER I HAD SURGERY, I WAS

5    RUSHED BACK TO THE HOSPITAL AND WAS VERY -- INFECTION HAD

6    AFFECTED MY WHOLE BODY.  MY LIFE HAS JUST BEEN

7    DEVASTATED.  I FEEL LIKE I AM A PRISONER IN MY OWN HOME

8    BECAUSE I CAN'T GO ANYWHERE.  I CAN'T DO ANYTHING UNLESS

9    SOMEBODY CARRIES ME OR HELPS ME.

10             I HAVE A WONDERFUL FAMILY THAT HAS TAKEN CARE

11   OF ME OR I WOULDN'T BE HERE TODAY.

12             WHEN I RECEIVED A LETTER REQUESTING THAT I

13   HAVE THE AIDS TEST AND THE HEPATITIS AND THE GONORRHEA,

14   THEN THAT JUST THREW ANOTHER LIGHT ON IT BECAUSE THAT

15   JUST SCARED ME TO DEATH.  AND IT WAS EMBARRASSING TO HAVE

16   TO GO IN AND HAVE THOSE TESTS MADE.

17             BUT THE THING THAT DEVASTATES ME IS THE FACT

18   THAT I CAN'T DO WHAT I USED TO DO.  IF IT WAS A NATURAL

19   PROCESS OF AGE OR WHATEVER, THEN IT WOULDN'T BOTHER ME.

20   BUT I CAN'T -- I DON'T HAVE A CHANCE TO GO CAMPING.  I

21   DON'T HAVE A CHANCE TO TAKE A VACATION OR EVEN GO TO

22   CHURCH.  AND IT HAS JUST RUINED MY LIFE.  PERIOD.

23             THE COURT:  THANK YOU, MA'AM.

24             YOU ALL SIT DOWN AT THE END OF THE TABLE.

25   EVERY TIME YOU SIT DOWN, YOU GET BEHIND THE MONITOR THAT

1    IS SITTING THERE, AND I WANT TO BE ABLE TO SEE YOU.

2              MS. STEINBECK:  MY NAME IS JENNIFER STEINBECK,

3    AND MY FATHER RICHARD STEINBECK, WAS ONE OF PHILIP JOE

4    GUYETT'S VICTIMS.  HE STOOD UP THERE OR HE SAT UP THERE A

5    LITTLE WHILE AGO AND SAID THAT HE MADE HIS DECISION IN

6    '05 TO START DOING THIS OR MAKING HIS BAD DECISIONS IN

7    '05 OF HARVESTING AND DOING HIS WRONGDOING WITH THE

8    ORGANS AND TISSUE OR WHATEVER IT MAY BE.  BUT MY FATHER

9    DIED IN '04.

10             SO WHAT MADE HIM START DOING HIS WRONGDOING IN

11   '04 WHEN MY FATHER DIED BECAUSE MY FATHER WAS ONE OF HIS

12   VICTIMS.

13             THE COURT:  YOUR FATHER HAD RECEIVED A TISSUE

14   TRANSPLANT?

15             MS. STEINBACK:  NO.  HE TOOK MY FATHER'S BODY

16   IN A -- IN A FUNERAL HOME IN AN EMBALMING ROOM AND

17   CHOPPED HIM UP AND DISTRIBUTED HIS BODY PARTS IN '04.

18             SO IF HE DECIDED IN '05 WHEN HIS PROCESSOR

19   NEEDED HELP, THEN WHAT MADE HIM CHOOSE MY FATHER IN '04?

20   BECAUSE THAT IS A YEAR DIFFERENCE THERE.

21             I DON'T SLEEP WELL AT NIGHT BECAUSE I HAVE

22   DREAMS OF MY FATHER ASKING ME WHY AM I LETTING THAT BE

23   DONE TO HIM.  I HAVE A TEN-YEAR OLD SON THAT SAYS I AM

24   ANGRY.  I AM SAD BECAUSE HIS BIRTHDAY IS TWO DAYS BEFORE

25   MY FATHER'S, AND THEN THERE IS FATHER'S DAY, AND ALL I

1    CAN THINK OF IS THAT MAN OVER THERE AND WHY A MONSTER

2    LIKE THAT CAN DO SOMETHING TO SOMEBODY, ANYBODY, NOT ONLY

3    MY FATHER, BUT OTHER PEOPLE.

4              AND MY FATHER DIED OF CANCER.  AND HE ALSO SAT

5    UP THERE AND SAID THAT HE DIDN'T GET ADEQUATE INFORMATION

6    FROM THE FAMILY MEMBERS OR OTHER PEOPLE.  HE BLAMED

7    EVERY -- HIS WRONGDOING ON EVERYBODY ELSE BUT HIMSELF.

8    HE KNEW WHAT HE WAS DOING WHEN HE DID IT.  HE NEEDS TO

9    TAKE RESPONSIBILITY FOR IT.

10             AND PLEASE, PLEASE PUT HIM AWAY.  NOBODY LIKE

11   THAT NEEDS TO BE OUT ON THE STREETS.  NOBODY.  BECAUSE

12   THAT IS A MONSTER.  THAT IS NOT HUMAN.  SOMEBODY THAT CAN

13   TAKE A HUMAN, SOMEBODY'S FAMILY MEMBER, AND TAKE THEM

14   INTO A COLD ROOM AND TAKE INFECTED BODY PARTS THAT THEY

15   KNOW HAS CANCER OR ANY OTHER KIND OF DISEASE AND TAKE

16   THOSE TISSUES OR THOSE ORGANS AND TAKE THEM AND PUT THEM

17   AND HARVEST THEM AND TAKE THEM AND PUT THEM AND SEND THEM

18   TO PEOPLE THAT ARE HEALTHY AND HAVE THEM PUT IN HEALTHY

19   PEOPLE, THAT IS MURDER.  THAT IS ATTEMPTING MURDER.

20             WHAT IF IT WAS PUT INTO A BABY THAT DOESN'T

21   HAVE A HEALTHY IMMUNE SYSTEM, OR NOT ONLY THE PERSON THAT

22   DOESN'T HAVE A HEALTHY IMMUNE SYSTEM.  HE NEEDS TO BE PUT

23   AWAY FOR AS LONG AS YOU CAN POSSIBLY PUT HIM AWAY.

24   PLEASE.  AND THAT'S ALL I ASK.

25             THE COURT:  THANK YOU, MA'AM.

1          MS. STEINBECK:  BUTCHER.  BUTCHER.  BUTCHER.

2          MR. COWLEY:  YOUR HONOR, JUST TO ADD SOME

3     INFORMATION, MR. GUYETT OBTAINED MS. STEINBECK'S CONSENT

4     TO PROCURE HER FATHER'S TISSUE BY PROMISING HER THAT IT

5     WAS GOING TO BE USED FOR CANCER RESEARCH.  AND INSTEAD,

6     THAT TISSUE, FOR A FEE PAID TO MR. GUYETT, WAS SENT TO

7     LOST MOUNTAIN TISSUE BANK TO USE FOR IMPLANTATION IN

8     OTHERS.

9          SO IT WAS -- HER FATHER IS ONE OF THE

10    INDIVIDUALS THAT MR. GUYETT LIED ABOUT HAVING CANCER, NOT

11    ONLY TO THE PROCESSORS OF THE TISSUE, BUT TO THE FAMILY

12    MEMBERS IN ORDER TO OBTAIN CONSENT.

13         YOUR HONOR, IN ADDITION TO THE TWO VICTIMS WE

14    HAVE HEARD FROM TODAY, WE WOULD ASK YOU TO CONSIDER THE

15    THREE VICTIMS' LETTERS THAT WERE ATTACHED TO MY

16    SENTENCING MEMORANDUM AS WELL AS THE TWO SUPPLEMENTAL

17    LETTERS, FROM MS. STEINBECK AND ONE FROM ANOTHER

18    INDIVIDUAL WITH THE SAME SAD STORY THAT HER HUSBAND HAD

19    PASSED AWAY OF CANCER AND CONSENT WAS GIVEN TO MR. GUYETT

20    UNDER THE UNDERSTANDING THAT THE TISSUE PROCURED WOULD BE

21    USED FOR CANCER RESEARCH ONLY, WHEN, IN FACT, IT WAS ALSO

22    SENT TO LOST MOUNTAIN TISSUE BANK TO BE PROCESSED AND

23    USED FOR IMPLANTATION IN OTHER HUMAN BEINGS.

24         THE COURT:  I HAD A LONG LETTER FROM ONE

25    PERSON THAT DID NOT HAVE A RETURN ADDRESS.  IT HAD A

1    PHONE NUMBER ON IT.  A KAREN CUMMINGS.

2              MR. COWLEY:  YES, YOUR HONOR.

3              THE COURT:  DID YOU GET A COPY OF THAT?

4              MR. COWLEY:  YES, YOUR HONOR, I DID RECEIVE A

5    COPY OF THAT.  AND JUST TO LET YOU KNOW, MS. CUMMINGS AND

6    HER HUSBAND, STEVE CUMMINGS, ARE HERE TODAY.

7              MS. CUMMINGS, THROUGH OUR INVESTIGATION, WE

8    ARE UNABLE TO CONCLUDE THAT MS. CUMMINGS WAS A VICTIM OF

9    MR. GUYETT.  BUT WE CAN SAY THAT SHE HAS HAD ISSUES WITH

10   AN ALLOGRAFT, AND THROUGH THAT HAS BECOME A VERY ZEALOUS

11   ADVOCATE FOR REFORMING THE INDUSTRY IN GENERAL AND HAS

12   TAKEN A VERY ACTIVE AND EFFECTIVE INTEREST IN CRIMINAL

13   PROSECUTIONS AROUND THE COUNTRY.

14             THIS IS NOT THE FIRST OR ONLY CRIMINAL CASE

15   INVOLVING THIS INDUSTRY, AND SHE HAS KEPT A KEEN INTEREST

16   IN THESE CASES, SIR.

17             THE COURT:  THE COURT APPRECIATES THE VICTIMS

18   WHO CAME FORWARD EARLIER PERSONALLY OR BY LETTERS, AND I

19   ASSURE YOU YOUR THOUGHTS AND COMMENTS WILL BE CONSIDERED

20   BY THE COURT IN DECIDING ON AN APPROPRIATE OUTCOME OF

21   THIS CASE.

22             IF THERE ARE OTHERS HERE WHO WANT TO SPEAK,

23   YOU WILL CERTAINLY BE GIVEN AN OPPORTUNITY.

24             ALL RIGHT.  MR. -- WELL, EITHER ONE OF YOU.  I

25   WOULD BE GLAD -- MR. BOYCE, YOU HAVE FILED A MOTION FOR A

1    DOWNWARD VARIANCE.  AND MR. COWLEY, YOU HAVE FILED A

2    MOTION FOR AN UPWARD VARIANCE.  I WILL BE GLAD TO HEAR

3    EACH OF YOU SPEAK ON YOUR MOTIONS AND GIVE YOU SOME TIME

4    FOR REBUTTAL AS WELL.

5               MR. BOYCE, I SUPPOSE I SHOULD HEAR FROM YOU

6    FIRST.

7               MR. BOYCE:  THANK YOU, YOUR HONOR.  AND OURS

8    IS REALLY AS MUCH A REQUEST.  WE DIDN'T KNOW WHERE THIS

9    GUIDELINE RANGE WAS GOING TO COME OUT AND SO AS MUCH AS

10   ANYTHING, WE WOULD REQUEST THAT THE COURT CONSIDER THIS

11   AS CONTRA TO THEIR REQUEST FOR VARIANCE ALSO.  DO YOU

12   WANT ME JUST TO MAKE THAT ONE ARGUMENT?

13              THE COURT:  THE FLOOR IS YOURS.  WHATEVER

14   ARGUMENT YOU WANT TO MAKE.

15              MR. BOYCE:  THANK YOU, YOUR HONOR.  I WILL BE

16   BRIEF.  MR. GUYETT DOES REQUEST THE OPPORTUNITY TO

17   ALLOCUTE.

18              THE COURT:  HE HAS THAT RIGHT AND HE WILL BE

19   GIVEN THAT RIGHT.

20              MR. BOYCE:  THANK YOU, YOUR HONOR.  I THINK

21   THE PRESENTENCE REPORT DOES A PRETTY GOOD JOB OF TELLING

22   THE LIFE HISTORY OF PHILIP GUYETT.  WE TRIED TO

23   SUPPLEMENT IT WITH THE MEMORANDUM THAT WE HAVE FILED TO

24   SHOW A LITTLE ABOUT THE HUMAN SIDE PHILIP GUYETT.

25              I KNOW THESE WONDERFUL PEOPLE OVER THERE FEEL

1    QUITE DIFFERENTLY RIGHT NOW AND QUITE ANGRY.  FOR THE

2    LAST TWO YEARS WHILE THIS CASE HAS GONE ON, MR. GUYETT

3    HAS CONTINUED TO EXPRESS REMORSE FOR HIS ACTIONS, HATED

4    THAT HE DIDN'T FORESEE THE POTENTIAL HARM THAT THIS COULD

5    HAVE CAUSED, AND HAS READILY, EVERY STEP OF THE WAY,

6    ACKNOWLEDGED THAT WHAT HE DID WAS WRONG AND HE NEVER

7    SHOULD HAVE DONE IT.

8              YOUR HONOR, THE TOUGH THING I KNOW IS THAT

9    THIS IS -- THE FACTS OF THIS CASE ARE DIFFICULT BECAUSE

10   WE ARE TALKING ABOUT HUMAN TISSUE, AND THAT MAKES IT SEEM

11   ESPECIALLY EGREGIOUS BECAUSE IT INVOLVES HUMAN BODY PARTS

12   OR TISSUE.  BUT I WOULD POINT OUT IT'S A VERY VITAL PART

13   OF OUR MEDICAL SYSTEM, AND IF IT SEEMS GROSS OR WHATEVER,

14   THE FACT THAT THIS MAN CHOSE TO UNDERTAKE THAT TYPE OF

15   BUSINESS, I HOPE THE COURT COULD REALIZE THAT IT IS AN

16   IMPORTANT PART OF IT.

17             THE PROBLEM IS HE FALSIFIED RECORDS AND IT

18   COULD HAVE BEEN VERY BAD BECAUSE APPARENTLY SOME PEOPLE

19   IN THE CHAIN WEREN'T DOING THEIR JOB EITHER.  THAT DOES

20   NOT MEAN HE IS BLAMING THEM.  I HEARD THIS LADY SAY THAT

21   HE IS PUTTING ALL THE BLAME ON EVERYBODY ELSE.  HE DOES

22   NOT PUT THE BLAME ON THEM.  IT'S JUST A FACT THAT UNDER

23   THE TOTAL SET OF CIRCUMSTANCES THE COURT COULD TAKE INTO

24   CONSIDERATION HIS NEGLIGENCE AND FAILING TO THINK THROUGH

25   THAT SOMEBODY DOWN THE LINE WOULD NOT HAVE DONE THEIR

1    JOB, ALSO.  THE PROTOCOLS, I WOULD SUGGEST TO THE COURT,

2    APPARENTLY WORK.

3          MR. COWLEY AND I HAD ANOTHER CASE RECENTLY

4    THAT HAD MUCH MORE SIGNIFICANT CONSEQUENCES TO IT AND THE

5    TWO GENTLEMEN IN THAT CASE RECEIVED, I THINK, FIVE

6    YEARS -- I BELIEVE IT WAS FIVE YEAR SENTENCES -- MR.

7    ROBBY SHARMA, WHERE THERE WAS SIGNIFICANT HARM, RECEIVED

8    A 54 MONTH SENTENCE; AND ANNUCK PATEL, IN THAT SAME CASE,

9    RECEIVED A 54 MONTH SENTENCE.

10         AND AGAIN, YOUR HONOR, THAT CASE I WOULD

11   SUGGEST TO THE COURT, I THINK THERE WERE SUBSTANTIAL

12   ASSISTANCE MOTIONS THERE, BUT THE CIRCUMSTANCES WERE MUCH

13   MORE EGREGIOUS AS FAR AS HARM GOES.

14         YOUR HONOR, PHILIP HAS BEEN LIVING IN

15   CALIFORNIA.  HE HAS COMPLETELY GOTTEN OUT OF THAT

16   BUSINESS, OBVIOUSLY, AND IN FACT, HAD ALREADY GOTTEN OUT

17   OF THE BUSINESS WHEN THE INVESTIGATORS CAME TO VISIT HIM.

18   HE HAD SHUT THE OFFICE DOWN HERE IN RALEIGH AND WAS

19   LOOKING OR WAS DOING SOMETHING ELSE.

20         HE AND HIS WIFE MOVED TO CALIFORNIA, BUT THE

21   STRESS AND THE HURT OF EVERYTHING THAT WAS -- THAT THEY

22   WERE GOING THROUGH BECAUSE OF HIS MISDEEDS CAUSED THEM TO

23   DIVORCE.  THEY HAVE TWO YOUNG KIDS, TWO BOYS, AGES 7 AND

24   8, AND PHILIP DID HAVE JOINT CUSTODY OF THEM.  HIS WIFE

25   LOST HER JOB AS A TEACHER, AND SO TO HELP ENDS MEET,

1    PHILIP, EVEN THOUGH THEY ARE DIVORCED, HAS ACTUALLY

2    EMPLOYED HER IN THE NEW BUSINESS THAT HE IS IN TO TRY TO

3    PROVIDE INCOME FOR HIS TWO SONS.

4         AS I AM SURE PHILIP WILL EXPLAIN TO YOU,

5    JUDGE, HIS TWO SONS ARE HIS WHOLE LIFE, AND IT'S ABOUT TO

6    KILL HIM THE THOUGHT OF BEING SEPARATED FROM THEM.  HE

7    KNOWS THAT IS A REAL POSSIBILITY, AND HE STRUGGLED WITH

8    THE DECISION OF WHETHER TO LET HIS SONS KNOW WHAT WAS

9    GOING ON.  HE DECIDED GIVEN THEIR YOUNG AGE AND NOT

10   KNOWING THE CONSEQUENCES OF TODAY, HE DECIDED THAT IT MAY

11   BE IN THEIR BEST INTEREST NOT TO TELL THEM UNTIL HE KNEW

12   WHAT THE COURT WAS GOING TO ORDER.

13        I ONLY MENTION THAT BECAUSE IT DOES NOW LOOK

14   LIKE HE IS LOOKING AT AN ACTIVE SENTENCE, AND WE ARE

15   REQUESTING THE COURT CONSIDER CONDITIONS OF RELEASE TO

16   ALLOW HIM TO GET HIS AFFAIRS IN ORDER AFTER TODAY.  HE

17   HAS ABIDED BY ALL HIS CONDITIONS OF RELEASE UP TO TODAY

18   AND HE HAS KNOWN ABOUT THIS INVESTIGATION SINCE 2007.  HE

19   HAS FINANCIAL OBLIGATIONS TO MAKE SURE HIS SONS ARE TAKEN

20   CARE OF.

21        HE DOESN'T KNOW WHAT IS GOING TO HAPPEN TO THE

22   BUSINESS BECAUSE HE IS CONCERNED HIS WIFE DOESN'T HAVE

23   THE CAPABILITY OF RUNNING IT ON HER OWN, AND HE IS TRYING

24   TO TRANSITION THAT BUSINESS TO SOMEONE ELSE SO HOPEFULLY

25   THERE WILL BE SOME INCOME AVAILABLE FOR HIS SONS.

1          YOUR HONOR, WE WOULD REQUEST THE COURT TAKE

2     INTO CONSIDERATION THE RANGE WE ARE AT, AND THE OTHER

3     INFORMATION WE PROVIDED IN OUR VARIANCE MEMORANDUM, AND

4     AGAIN, HE WOULD LIKE TO SPEAK TO THE COURT DIRECTLY, TOO.

5          THE COURT:  WELL, I WILL GIVE HIM THAT

6     OPPORTUNITY.  I THINK I NEED TO RULE ON THE MOTIONS FOR

7     DEPARTURE ONE WAY OR THE OTHER FIRST.

8          MR. COWLEY.

9          MR. COWLEY:  THANK YOU, YOUR HONOR.

10          YOUR HONOR, TO TOUCH BRIEFLY ON MR. BOYCE'S

11     COMMENTS ON A COMPLETELY UNRELATED CASE, THAT WAS A

12     COMPLETELY DIFFERENT PROCEDURAL AND FACTUAL SITUATION

13     WHERE THERE WAS A 5K INVOLVED, AND THOSE INDIVIDUALS

14     PROVIDED INFORMATION THAT LEAD TO THE INDICTMENT OF THE

15     CEO OF A RELATIVELY LARGE CORPORATION AND ANOTHER PUBLIC

16     HEALTH MATTER.  I THINK IT'S COMPLETELY APPLES AND

17     ORANGES TO TAKE THOSE SENTENCES AS A LODESTAR FOR WHAT

18     THE SENTENCE HERE SHOULD BE.

19          YOUR HONOR, THIS IS AN EXEMPLARY CASE FOR BOTH

20     AN UPWARD DEPARTURE AND UPWARD VARIANCE AS WELL AS THERE

21     ARE SPECIFIC INSTANCES WITHIN THE GUIDELINES.  IT

22     SUGGESTS FOR UPWARD DEPARTURE THAT APPLY HERE.  I THINK

23     FIRST, STARTING OFF WITH AN UPWARD DEPARTURE FOR THE

24     EXTREME PSYCHOLOGICAL DISTRESS THAT THIS DEFENDANT HAS

25     CAUSED.  I THINK IT IS EVIDENT IN A NUMBER OF LETTERS THE

1    COURT HAS SEEN AND SOME OF THE ALLOCUTIONS THAT YOU HAVE

2    HEARD TODAY.

3              YOU HAVE VICTIMS, ELDERLY VICTIMS, HAVING TO

4    GO THROUGH STD TESTING, HAVING TO COME TO THE

5    EMBARRASSMENT THAT CAN BE ASSOCIATED WITH THAT.  YOU HAVE

6    VICTIMS THAT HAVE TISSUE IMPLANTED IN THEM, INSIDE THEM,

7    YOUR HONOR, THAT WILL BE IN THERE FOR THE REST OF THEIR

8    LIVES.  AND AS ONE OF THE VICTIM LETTERS STATED, THERE

9    ARE SOME DISEASES, SOME COMMUNICABLE DISEASES WHOSE

10   CONDITIONS DON'T SHOW FOR YEARS.  SO IT'S TEN YEARS,

11   POSSIBLY FOR THE REST OF THEIR LIVES, THEY WALK AROUND

12   WITH AN UNCERTAINTY OF NOT KNOWING WHAT IS INSIDE OF THEM

13   AND WHAT IT CAN.

14             AND THEN ON THE OTHER END, ON THE DONOR END,

15   YOU HAVE HEARD VERY COMPELLING ALLOCUTIONS FROM MS.

16   STEINBACK TODAY AND FROM A LETTER FROM ANOTHER VICTIM

17   THAT THEY HAVE TO LIVE FOR THE REST OF THEIR LIVES

18   KNOWING THAT THEY ENTRUSTED -- THEY ENTRUSTED THEIR LOVED

19   ONE'S LEGACY WITH MR. GUYETT IN THAT HE TOLD THEM THEY

20   WERE GOING TO BE USING THEIR TISSUE FOR CANCER RESEARCH.

21             THEY HAVE TO KNOW FROM NOW ON THAT THIS

22   DEFENDANT LIED TO THEM ABOUT WHAT WAS GOING TO HAPPEN TO

23   THEIR LOVED ONE'S REMAINS.  THAT IS SOMETHING THAT IS NOT

24   GOING TO GO AWAY, NOT EVEN AFTER MR. GUYETT GETS OUT OF

25   PRISON, YOUR HONOR, AT SOME TIME IN THE FUTURE.

1          I THINK THAT IS THE FIRST ASPECT THAT SHOULD

2     BE TAKEN INTO ACCOUNT WHEN YOU ARE CONSIDERING AN UPWARD

3     DEPARTURE TO COME UP WITH A NEW GUIDELINES RANGE.

4          SECOND IS EXTREME CONDUCT, YOUR HONOR.  MR.

5     GUYETT'S CONDUCT IS HEINOUS.  IT IS DIFFICULT TO THINK OF

6     A MORE DIRECT, A MORE TERRIFYING INTRUSION THAN HAVING

7     SOMETHING IMPLANTED IN YOUR BODY THAT CAME -- THAT WAS

8     HARVESTED IN AN ILLEGAL WAY AND THAT WAS HARVESTED

9     THROUGH A MEANS BY THIS DEFENDANT WHO WAS TELLING LIES

10    AND COVERING UP DISEASES AND THE LIKE THAT THESE DONORS

11    HAD.

12          AND THE THIRD GROUNDS, JUST WITHIN A PREFERRED

13    UPWARD DEPARTURE RANGE, NOT EVEN TALKING ABOUT A VARIANCE

14    YET, WHICH I THINK IS PARTICULARLY APT IS UPWARDLY

15    DEPARTURE FOR RISKING PUBLIC HEALTH.  NOW, IT'S IMPORTANT

16    TO POINT OUT UNDER FDA REGULATIONS MR. GUYETT MAKES THE

17    ARGUMENT THAT HE WASN'T THE ULTIMATE DECISION MAKER AS TO

18    WHETHER OR NOT ANY TISSUE WOULD BE IMPLANTED IN ANYONE.

19    BUT HE DID PROVIDE DATA TO THOSE DECISION MAKERS THAT

20    THEY RELIED ON.  HE WAS ON THE FRONT LINES OF QUALITY

21    CONTROL LIKE OTHER TISSUE HARVESTERS AROUND THE COUNTRY.

22    THE WHOLE SYSTEM RELIES ON INDIVIDUALS LIKE HIM TO BE

23    HONEST AND FORTHCOMING AND TRUTHFUL IN THIS PROCESS.

24    THAT DIDN'T HAPPEN HERE.

25          AS MS. WESTLY'S REPORT LAYS OUT, THE 127

1    VICTIMS THAT WE WERE ABLE TO IDENTIFY ARE VICTIMS THAT WE

2    KNOW HAD TISSUE IMPLANTED IN THEM FROM DONORS HE TOLD A

3    LIE ABOUT.  MORE BROADLY, OVER 700 PATIENTS AROUND THE

4    WORLD HAD TISSUE IMPLANTED IN THEM THAT WAS HARVESTED BY

5    MR. GUYETT AND HIS COMPANY.

6              NOW, WE CAN'T PROVE AND WE ARE NOT TRYING TO

7    PROVE THAT HE TOLD LIES ABOUT EVERY SINGLE ONE OF THOSE,

8    BUT WE CAN SAY THAT EACH AND EVERY ONE OF THOSE

9    INDIVIDUALS HAVE TISSUE IMPLANTED IN THEM IN SOMEONE FROM

10   SOMEONE WHO WAS DISHONEST AND SOMEONE WHOSE COMPANY WAS

11   SHUT DOWN BECAUSE THEY FAILED TO ABIDE BY FDA

12   REGULATIONS.

13             HE CREATED A SYSTEMIC PROBLEM, YOUR HONOR,

14   THAT I THINK SHOULD BE TAKEN INTO ACCOUNT UNDER THE

15   GUIDELINES.

16             AND I AM MOVING BEYOND THE GUIDELINES AND

17   CONSIDERING THE FACTORS IN SECTION 3553 FOR A VARIANCE.

18   I THINK THEY BEAR QUITE STRONGLY ON THIS.  ONE, AGAIN, IS

19   THE NATURE AND CIRCUMSTANCES OF THE CRIME THAT WE HAVE

20   HEARD ABOUT THROUGHOUT THIS HEARING TODAY, AND I THINK

21   ALMOST SPEAK FOR THEMSELVES.

22             AND ONE THING TO ADD IN RELATION TO THIS, YOUR

23   HONOR, IS THAT THE RISK OF HEALTH AND THE RISK OF DEATH

24   THAT MR. GUYETT EXPOSED HIS VICTIMS TO.  IT'S EASY TO

25   JUST THINK ABOUT THE RISK HERE AS A RISK OF SPREADING

1    DISEASE.  AND MR. BOYCE IS CORRECT THAT THERE HASN'T BEEN

2    A CASE OF VICTIM WE HAVE IDENTIFIED THAT HAS CONTRACTED

3    HEPATITIS OR CONTRACTED AIDS OR ANYTHING LIKE THAT BY

4    VIRTUE OF HIS ACTIVITIES.

5              WE DO HAVE ONE VICTIM WHO, ACCORDING TO HIS

6    DOCTOR, GOT A STAFF INFECTION WHICH LEAD TO NUMEROUS

7    SURGERIES BECAUSE THE TISSUE WAS HARVESTED IN UNSANITARY

8    CONDITIONS.  BUT WHAT I WOULD ASK YOU TO TAKE SPECIAL

9    EMPHASIS ON IS THE DECLARATIONS SUBMITTED BY DR. DIRSCHL,

10   WHO IS THE CHIEF OF ORTHOPEDIC SURGERY AT UNC HOSPITALS.

11   HE MAKES A VERY IMPORTANT POINT; THAT IN ADDITION TO

12   SPREADING OR INCREASING THE RISK OF INFECTIOUS DISEASE

13   SPREADING, WHAT HE DID AFFECTS THE FAILURE RATE OF THESE

14   PROCEDURES, THAT WHEN YOU TAKE TISSUE OR BONE FROM AN

15   INDIVIDUAL THAT HAD CANCER, THAT UNDERWENT CHEMOTHERAPY,

16   THAT WAS BEYOND THE AGE LIMIT UNDER FDA REGULATIONS TO

17   HAVE THEIR TISSUE UTILIZED FOR OTHER PEOPLE, WHAT YOU ARE

18   DOING IS THAT AFFECTS THE STRENGTH OF THAT TISSUE, THAT

19   AFFECTS THE STRENGTH OF THAT BONE THAT HAS BEEN IMPLANTED

20   IN A WAY THAT UNLESS THE MEDICAL PERSONNEL UTILIZING THIS

21   KNOW THAT IT'S THERE, THERE IS NO WAY THEY CAN DETECT IT.

22   IT'S NOT AS IF YOU CAN LOOK AT A BONE ALLOGRAFT AND KNOW

23   IT'S STRUCTURALLY UNSOUND OR LOOK AT A TISSUE AND KNOW

24   THAT IT'S STRUCTURALLY UNSOUND.

25              SO, IN ADDITION TO RISKING THE LIVES, THE

1   LIVES OF THESE PATIENTS THROUGH POSSIBLE INFECTIONS, HE

2   WAS RISKING IT BY INCREASING THE POSSIBILITY OF FAILURE

3   IN THESE PROCEDURES.  AND WE ARE LEFT WITH THE TRAGIC

4   CIRCUMSTANCES IN THIS CASE WHERE THERE ARE MULTIPLE

5   VICTIMS, INCLUDING THE ONE THAT YOU HEARD FROM TODAY THAT

6   HAVE HAD SUBSTANTIAL COMPLICATIONS FROM THEIR PROCEDURES.

7   WE CAN'T SAY BEYOND A REASONABLE DOUBT THAT IT WAS CAUSED

8   BY MR. GUYETT, BUT WE CAN SAY THAT IT WAS HIS ACTIONS

9   THAT SUBSTANTIALLY INCREASE THE LIKELIHOOD OF INSTANCES

10  LIKE THAT TAKING PLACE.

11          ANOTHER THING, YOUR HONOR, IS DETERENCE.

12  THAT, AS I BRIEFLY ALLUDED TO BEFORE, THERE HAVE BEEN A

13  NUMBER OF CASES ACROSS THE COUNTRY INVOLVING THIS

14  INDUSTRY WHERE PEOPLE MADE SIMILAR DECISIONS AS MR.

15  GUYETT.  THERE HAS BEEN A CASE IN PHILADELPHIA.  THERE

16  HAS BEEN A CASE IN BROOKLYN, NEW YORK.  AN INDIVIDUAL

17  NAMED MR. MASSERINO WHO WAS DOING THE SAME THING EXCEPT

18  NOT EVEN OBTAINING CONSENT THROUGH LIES, JUST SIMPLY

19  HARVESTING TISSUE FROM BODIES WITHOUT CONSENT OF ANY NEXT

20  OF KIN.

21          RECENTLY IN LOS ANGELES, YOUR HONOR, AN

22  EXECUTIVE OF THE UCLA BODY PROGRAM PLED GUILTY TO

23  SELLING, STEALING AND SELLING BODY PARTS FROM THAT

24  PROGRAM.  IN OTHER WORDS, THIS IS AN INDUSTRY WHERE

25  I THINK THAT THE COURTS, BOTH ON FEDERAL AND STATE LEVEL,

1   WILL RECEIVE MORE AND MORE CASES LIKE THIS.  AND I THINK

2   IT'S IMPORTANT THAT WE PUT A CRIMINAL DETERENCE IN PLACE

3   TO MAKE IT CRYSTAL CLEAR TO INDIVIDUALS ON THE FRONT LINE

4   OF QUALITY CONTROL LIKE MR. GUYETT, THAT THIS SORT OF

5   BEHAVIOR WON'T BE TOLERATED, AND THAT THE PUBLIC HEALTH

6   WILL BE PROTECTED.

7          SO IN ORDER TO PROTECT THE PUBLIC BOTH HERE

8   AND ACROSS THE WORLD FOR PEOPLE WHO RECEIVE

9   IMPLANTATIONS, WE NEED TO DRAW A STRONG LINE THAT THIS

10  TYPE OF BEHAVIOR, THIS TYPE OF BEHAVIOR THAT RISKS OTHER

11  PEOPLE'S LIVES, WON'T BE TOLERATED.

12         FINALLY, YOUR HONOR, I WOULD ASK YOU TO

13  CONSIDER MR. GUYETT'S BACKGROUND.  THIS IS NOT HIS FIRST

14  RUN IN WITH THE LAW.  AS THE PRESENTENCE REPORT MAKES

15  CLEAR, THE ONE PAST CRIMINAL CONVICTION, HE WAS ACTUALLY

16  DETAINED ON THE SUSPICION OF MURDER IN CORONA,

17  CALIFORNIA, AND AS A RESULT INVESTIGATORS EXECUTED A

18  SEARCH WARRANT OF HIS RESIDENCE.  THEY LOCATED REMAINS OF

19  VARIOUS CONDITIONS, INCLUDING SOME OF WHICH HAD A STRONG

20  SMELL OF ROTTING MEAT.

21         THIS IS SOMEONE WHO HAS CONTINUOUSLY SHOWED

22  DISRESPECT OF THE REMAINS OF THE DEAD AND DISRESPECT FOR

23  ABIDING BY REGULATORY CONDITIONS OF THE INDUSTRY HE HAS

24  CHOSEN TO ENGAGE IN.

25         YOUR HONOR, 84 MONTHS IS REFERENCED IN MY

1    SENTENCING MEMORANDUM.  THAT WAS MEANT TO BE A MINIMUM.

2    I THINK TO ADEQUATELY PROTECT SOCIETY FROM MR. GUYETT, TO

3    ADEQUATELY PROTECT SOCIETY FROM OTHERS IN HIS SITUATION

4    WHO WOULD BE IN A POSITION TO TELL THE SAME LIES AND HURT

5    PEOPLE THE SAME WAY, AND TO TRULY CAPTURE THE HEINOUS

6    NATURE OF THE CRIME, SOMETHING WELL BEYOND SEVEN YEARS IS

7    APPROPRIATE IN THIS CASE, YOUR HONOR.

8              IT WILL BE WELL BEYOND SEVEN YEARS THAT THESE

9    INDIVIDUALS THAT YOU HAVE HEARD FROM TODAY AND RECEIVED

10   LETTERS FROM WILL STILL BE SUFFERING AND WONDERING AND

11   THINKING ABOUT HOW MR. GUYETT IMPACTED THEIR LIFE.

12             SO WE WOULD ASK FOR AN UPWARD DEPARTURE AND AN

13   UPWARD VARIANCE, AS HIGH AS THE SENTENCE THE COURT FEELS

14   IS APPROPRIATE.

15             THE COURT:  MR. GUYETT, I WOULD BE GLAD TO

16   HEAR FROM YOU, SIR.

17             THE DEFENDANT:  I WROTE SOME STUFF DOWN JUST

18   SO I CAN KEEP MY MIND STRAIGHT.  I AM VERY SORRY FOR ANY

19   AND ALL PROBLEMS THAT I HAVE CAUSED.  WHEN I OPENED UP MY

20   BUSINESS, MY INTENT WAS TO TRY TO HELP PEOPLE.  IT WAS

21   NEVER TO HURT ANYBODY.  I WAS HOPING TO BE A PART OF A

22   TEAM OF ORGANIZATIONS AND HELP THOSE WHO WISHED TO DONATE

23   TO DONATE.

24             OPENING UP SUCH A BUSINESS, IT'S HARD TO DO.

25   IT'S NOT EASY.  YOU JUST CAN'T OPEN IT UP.  YOU HAVE TO

HAVE EXPERIENCE.  YOU HAVE TO HAVE A REPUTATION TO
PERFORM, TO MAKE SURE YOU ARE WITHIN THE STANDARDS AND
ALL OF THAT DID HAPPEN BEFORE I DID START RECOVERING.

        I MOVED MY FAMILY TO NORTH CAROLINA IN 2004
BECAUSE IT WAS A GREAT PLACE TO LIVE.  I WAS LIVING IN
LAS VEGAS AT THE TIME.  I HAD TWO YOUNG KIDS THAT HADN'T
STARTED SCHOOL YET, AND I WANTED WHAT WAS BEST FOR THEM.
AND LIKE MANY OTHER PEOPLE THAT COME TO NORTH CAROLINA,
WE FOUND IT A GREAT PLACE.

        WHEN I MOVED HERE, I ALSO MOVED MY BUSINESS AT
THE TIME.  I RECOVERED FOR DIFFERENT AGENCIES.  I
RECOVERED FOR THOSE AGENCIES REGARDING TRANSPLANTS AND I
ALSO RECOVERED FOR DUKE UNIVERSITY PARKINSON'S AND
ALZHEIMER'S RESEARCH, HARVARD SCHOOL OF MEDICINE'S BRAIN
PAIN PROGRAM, MULTIPLE SCLEROSIS RESEARCH IN LOS ANGELES,
AND AT THE TIME, I RAN THE ONLY NON-HOSPITAL BASED
RECOVERY SERVICE THAT WAS AUTHORIZED TO RECOVER TISSUE
FOR THE NATIONAL CANCER INSTITUTE.  I WAS VERY PROUD,
VERY HONORED TO BE IN THAT BUSINESS.

        AS I MENTIONED BEFORE ON THE STAND, IN 2005,
LATE SPRING OF 2005, I REALIZED THAT I SHOULD NEVER HAVE
GOT INTO THE FIELD.  I WAS BECOMING IN DEBT PERSONALLY.
I WAS NOT PREPARED FOR RUNNING THAT TYPE OF BUSINESS.
UNFORTUNATELY, I DIDN'T BECOME AWARE OF IT UNTIL IT WAS
TOO LATE ON MY END, AND I THOUGHT AND I KNEW THE RIGHT

1    THING TO DO WAS TO CLOSE DOWN AND GET OUT OF THE

2    BUSINESS.

3          I MAY HAVE BEEN GOOD AT RECOVERY, BUT I WAS

4    NOT A GOOD BUSINESS OWNER.  I MADE VERY BAD DECISIONS AT

5    THE END.  AND AGAIN, JUDGE, MY INTENT WAS NEVER TO HURT

6    ANYBODY.  I DON'T WANT TO HURT ANYBODY.  I DON'T WANT TO

7    SEE PEOPLE GET HURT.  I -- AND I KNOW PROCESSORS WOULDN'T

8    WANT THAT.  NO ONE WOULD WANT THAT.

9          I GAINED NOTHING FROM IT.  NO ONE DOES.  AND

10   I HONESTLY LIKED TALKING TO THE FAMILIES.  I ENJOYED

11   CONVERSATIONS THAT I HAD WITH THEM.  AND I AM VERY SAD

12   THAT I HURT SO MANY OF THEM BECAUSE, AGAIN, IT WAS NOT MY

13   INTENT.

14         SINCE ALL THIS HAS HAPPENED, NOT A DAY GOES BY

15   THAT I HATE WHAT I HAVE DONE.  JUST ABOUT EVERY DAY I

16   WOULD LOG ON TO THE FDA WEBSITE AND CDC WEBSITE TO SEE IF

17   ANYONE WAS EVER HURT.

18         ALL THIS HAS OBVIOUSLY PUT A STRAIN ON MY

19   FAMILY LIFE.  I HAVE LOST A LOT OF FRIENDS.  I HAVE LOST

20   TRUST FROM FRIENDS, FAMILY, AND PEOPLE I WORKED WITH.

21   AFTER I HAD CLOSED DOWN MY BUSINESS, I HAVE NEVER -- I

22   DID NOT INTEND AND I HAVE NOT TRIED TO ENTER IT AGAIN.  I

23   HAVE WORKED IN A RECYCLING TYPE BUSINESS AND WORKED AS A

24   LAND SURVEYOR AND TRIED TO GET AS FAR AWAY FROM IT AS

25   POSSIBLE.

1            AS MY LAWYER STATED, BECAUSE OF ALL OF THIS,

2    MY WIFE HAD FILED FOR DIVORCE.  I DO HAVE SHARED CUSTODY

3    OF MY TWO BOYS.  I SUPPORT MY EX-WIFE 100 PERCENT

4    FINANCIALLY AS WELL AS MY KIDS.  I ALSO PROVIDE JOBS FOR

5    FIVE INDIVIDUALS, AND I WOULD HATE TO THINK THAT BECAUSE

6    OF MY STUPID ACTIONS THAT -- THAT I WILL LOSE EVERYTHING;

7    THAT I WILL LOSE MY KIDS AND PEOPLE LOSE THEIR JOBS.  AND

8            I JUST CAN'T PUT INTO WORDS HOW THIS HAS

9    AFFECTED ME BECAUSE I KNOW IT HAS HURT SO MANY PEOPLE; SO

10   MANY PEOPLE, JUDGE.  AND I DON'T KNOW WHAT ELSE TO SAY.

11   I DON'T.  OTHER THAN I AM ASKING FOR FORGIVENESS.  I AM

12   ASKING FOR YOUR MERCY.  I NEED TO CONTINUE TO BE ABLE TO

13   SUPPORT MY KIDS AND ANYTHING THAT YOU CAN DO TO HELP ME

14   DO THAT, I WOULD APPRECIATE IT.  IT WOULD MEAN THE WORLD

15   TO ME, AND I DON'T WANT TO LOSE THAT.

16            THE COURT:  YOU MAY HAVE A SEAT.

17            ALL RIGHT.  COUNSEL WHO ARE HERE IN THE TWO

18   CASES THAT ARE CURRENTLY SCHEDULED FOR JURY SELECTION

19   TOMORROW, UNITED STATES VERSUS JOHNNY GASKINS AND UNITED

20   STATES AGAINST MICHAEL WILLIAMS, IT'S QUITE OBVIOUS TO ME

21   THAT I AM NOT GOING TO BE ABLE TO GET INTO ANYTHING

22   INVOLVING YOUR CASES TODAY.  I HAD HOPED TO HAVE SOME

23   HEARINGS ON MOTIONS AND THAT TYPE OF THING.  OBVIOUSLY, I

24   AM NOT GOING TO BE ABLE TO DO IT BECAUSE I HAVE SEVERAL

25   SENTENCINGS AND REVOCATION HEARINGS, SO COUNSEL IN THOSE

1    CASES ARE FREE TO LEAVE TO BE BACK HERE AT 10:00 O'CLOCK

2    TOMORROW FOR HEARING ON WHATEVER MOTIONS AND OTHER

3    PRETRIAL MATTERS WE HAVE.  AND WE WILL HAVE JURY

4    SELECTION IN THOSE CASES STARTING WEDNESDAY MORNING

5    INSTEAD OF TUESDAY MORNING.

6          BETH, YOU CAN NOTIFY SCOTT TO BRING THE JURY

7    IN WEDNESDAY MORNING AT 9:00 O'CLOCK.

8          AND COUNSEL AND PARTIES IN ALL OTHER

9    SENTENCINGS AND ALL THOSE MATTERS, I WILL GET TO AS MANY

10   OF THOSE AS I CAN THIS AFTERNOON.  PRESENTLY, I AM GOING

11   TO TAKE A 15 MINUTE RECESS WHILE I CONSIDER THIS MATTER.

12         (WHEREUPON, A SHORT RECESS WAS TAKEN.)

13         THE COURT:  COUNSEL, WE DID NOT ADDRESS THE

14   ISSUE OF RESTITUTION.

15         MR. WASCO OF THE PROBATION OFFICE HAS HANDED

16   ME A LIST OF VICTIMS AND THE AMOUNTS THERE.  I UNDERSTAND

17   THAT HE HAS PROVIDED EACH OF YOU WITH THE SAME LIST PRIOR

18   TO COURT TODAY, SO AT THIS TIME I WILL BE GLAD TO HEAR

19   YOUR ARGUMENTS ONE WAY OR THE OTHER AS TO RESTITUTION AND

20   BEGINNING WITH THE LIST AS PROPOSED BY MR. WACO.

21         MR. COWLEY:

22         MR. COWLEY:  THANK YOU, YOUR HONOR.  YOUR,

23   HONOR, TO BEGIN WITH ON THAT ISSUE, PURSUANT TO THE PLEA

24   AGREEMENT, THERE WAS MONEY THAT THE UNITED STATES WAS

25   ABLE TO SEIZE FROM MR. GUYETT.  THERE IS THE LIS PENDENS

1    ON HIS HOUSE.  HE AGREED IN THE PLEA AGREEMENT THAT THAT

2    AMOUNT WAS SUBJECT TO FORFEITURE IN ORDER TO FACILITATE

3    SOME OF THE RESTITUTION.  WE ALSO, JUST TO CLEAN THAT UP,

4    WE HAVE A CONSENT DECREE FOR FORFEITURE THAT HAS BEEN

5    SIGNED BY THE PARTIES, IF WE CAN SUBMIT THAT TO THE

6    COURT.

7              THE COURT:  ALL RIGHT.

8              MR. COWLEY:  YOUR HONOR, THIS RESTITUTION

9    ORDER, THIS PROPOSED RESTITUTION ORDER REPRESENTS A FEW

10   DIFFERENT AVENUES OF REDRESS.  IN LOOKING AT IT, MOST OF

11   THESE ARE -- REPRESENT THE COST OF VICTIMS' OUT-OF-POCKET

12   FOR TESTING OF INFECTIOUS DISEASES.  SO THEY WERE

13   INFORMED OF MR. GUYETT'S SCHEME.  THEY WERE INFORMED OF

14   THE FACT THAT THEY MIGHT HAVE BEEN EXPOSED TO INFECTIOUS

15   DISEASES SUCH AS HEPATITIS, HIV AND THE LIKE, AND THIS

16   REPRESENTS THEIR OUT-OF-POCKET EXPENSES FOR GETTING THE

17   TESTS.  MR. BRUDEN WHO WORKS AS A CONSULTANT WITH THE

18   FDA, ALONG WITH A TEAM OF INDIVIDUALS, NOT ONLY SENT OUT

19   CORRESPONDENCE, BUT ATTEMPTED TO CONTACT BY PHONE ALL 127

20   VICTIMS THAT WERE IDENTIFIED IN THIS MATTER IN ORDER TO

21   FIGURE OUT WHO HAD PAID OUT-OF-POCKET EXPENSES FOR THIS

22   MATTER.

23             THAT REPRESENTS ALL THE VICTIMS ON THE FIRST

24   PAGE EXCEPT THE VICTIM AT THE BOTTOM, VICTIM B.R.   I

25   WILL USE HIS INITIALS TO PROTECT HIS CONFIDENTIALITY

1    HERE.  HE HAD AN ALLOGRAFT THAT WAS HARVESTED BY MR.

2    GUYETT AND A STAFF INFECTION RESULTED, AND HIS DOCTOR

3    SUBMITTED AN INTERVIEW.  MR. BRUDEN ACTUALLY INTERVIEWED

4    HIM TELEPHONICALLY, AND IT WAS HIS DOCTOR'S CONCLUSION

5    THAT THAT STAFF INFECTION RESULTED FROM THE PROCUREMENT

6    OF THAT TISSUE IN AN UNSTERILE ENVIRONMENT.  IN OTHER

7    WORDS, THAT WAS ONE OF THE THINGS THAT THE FDA FOUND THAT

8    MR. GUYETT -- A REGULATION THEY FOUND THAT HE VIOLATED,

9    AND WE SUBMIT THAT THAT IS ACTUALLY PART OF THE CRIMINAL

10   SCHEME HERE BECAUSE HE WAS REPRESENTING TO THE OUTSIDE

11   WORLD AND CONTRACTUALLY REPRESENTING TO THE PROCESSORS

12   THAT HE WAS WORKING WITH THAT HE WAS MAINTAINING STERILE

13   CONDITIONS.

14          AND SO MOST OF THE AMOUNT IS DRIVEN BY THOSE

15   PROCEDURES THAT VICTIM B.R. HAD TO HAVE.  THE AMOUNT THAT

16   GOES TO HIM AND THE REST IS AMOUNTS STILL OWED TO MEDICAL

17   PROVIDERS AS A RESULT OF THE SURGERIES.

18          AND THEN FINALLY, THE LAST ENTRY, THE

19   INSURANCE ENTRY IS AMOUNTS PAID BY HIS INSURANCE COMPANY

20   FOR THOSE PROCEDURES.

21          ADDITIONALLY, YOU HAVE VICTIM E.W. WHO IS THE

22   SECOND TO THE LAST.  SHE PAID OR HAD THE TISSUE REMOVED

23   AFTER THE VOLUNTARY RECALL.  SHE HAD THE TISSUE THAT WAS

24   PUT IN HER, THE ALLOGRAFT THAT WAS PUT IN HER THAT WAS

25   HARVESTED BY MR. GUYETT REMOVED, AND THIS REPRESENTS HER

1    OUT-OF-POCKET EXPENSES FOR THIS MATTER.

2              AND THAT IS AN EXPLANATION OF THE RESTITUTION

3    ORDER, YOUR HONOR, AND WE ASK FOR IT TO BE SIGNED.

4              THE COURT:  MR. BOYCE.

5              MR. BOYCE:  YOUR HONOR, AS MR. GUYETT

6    EXPLAINED, HE DOES NOT BELIEVE THAT HE WAS OPERATING IN

7    AN UNSTERILE ENVIRONMENT.  HE FIRMLY BELIEVES THAT PART

8    OF THE PRACTICE WAS OKAY.  THAT WAS NOT CHARGED IN THE

9    CRIMINAL INFORMATION.

10             IF HE WAS NEGLIGENT AND THERE WAS SOME

11   UNSTERILE CONDITION, HE IS NOT AWARE OF IT, BUT WE WOULD

12   OBJECT TO THOSE PORTIONS RELATING TO THE B.R. THAT

13   RELATES TO UNSTERILE CONDITIONS AS NOT PART OF THE

14   CRIMINAL OFFENSE CONDUCT.

15             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

16   IN THE ORDER THAT I SIGNED, IT'S YOUR POSITION THAT THE

17   TRUE NAMES SHOULD BE REDACTED.

18             MR. COWLEY:  YOUR HONOR, BECAUSE WE HAVE NOT

19   OBTAINED CONSENT FROM THESE VICTIMS TO USE THEIR NAME, I

20   WOULD ASK THAT ANY IDENTIFIERS BE REDACTED, SIR, JUST

21   BECAUSE AS I JUST EXPLAINED, THESE ARE RESULTS TO SOME

22   VERY SENSITIVE TESTING AND THE LIKE, SO THAT WOULD BE OUR

23   RECOMMENDATION.

24             THE COURT:  VERY WELL.  ALL RIGHT.  THE COURT

25   ADOPTS THE AMOUNT PROPOSED BY THE PROBATION, BY THE U.S.

1    ATTORNEY AND THE PROBATION OFFICE, AND ORDERS THAT THOSE

2    ACTUAL NAMES BE REDACTED UPON THE PROPOSED ORDER.

3              I WANT TO ASK ALL OF YOU TO STEP ASIDE.  MR.

4    WASCO IS GOING TO BE WORKING ON SOMETHING FOR ME FOR THE

5    NEXT FEW MINUTES.  I AM GOING TO TAKE UP ANOTHER MATTER

6    AND I WILL COME BACK TO THIS SHORTLY.

7              (WHEREUPON, THE COURT HEARD ANOTHER MATTER.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  ALL RIGHT.  GUYETT, COME BACK

2    AROUND, PLEASE.

3          ALL RIGHT.  STAND UP, MR. GUYETT.  EXCEPT AS

4    HERETOFORE STATED, THE COURT FINDS THE BASES FOR THE

5    FINDINGS CONTAINED IN THE PRESENTENCE REPORT CREDIBLE AND

6    RELIABLE AND THEREFORE ADOPTS THOSE FINDINGS.  BASED ON

7    THOSE FINDINGS, THE COURT HAS CALCULATED THE IMPRISONMENT

8    RANGE PRESCRIBED BY THE ADVISORY GUIDELINES.  THE COURT

9    HAS CONSIDERED THAT RANGE AS WELL AS OTHER RELEVANT

10   FACTORS SETS FORTH IN THE ADVISORY SENTENCING GUIDELINE

11   AND THOSE SET FORTH IN 18 U.S.C. SECTION 3553(A).

12         PURSUANT TO THE SENTENCING REFORM ACT OF 1984,

13   AND IN ACORDDANCE WITH THE SUPREME COURT DECISION IN

14   UNITED STATES AGAINST BOOKER, IT'S THE JUDGMENT OF THE

15   COURT THAT THE DEFENDANT, PHILIP JOE GUYETT, JR., IS

16   COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A

17   TERM OF 96 MONTHS ON EACH COUNT TO BE SERVED

18   CONCURRENTLY.

19         THE SENTENCE REPRESENTS AN UPWARD VARIANCE

20   FROM THE APPLICABLE GUIDELINE RANGE DUE TO THE EXTREME

21   PSYCHOLOGICAL STRESS TO THE VICTIMS WHO RECEIVED

22   COMPROMISED TISSUE AS A RESULT OF THE INSTANT OFFENSE,

23   THE EXTREME CONDUCT OF THE DEFENDANT BY KNOWINGLY

24   ALLOWING CONTAMINATED TISSUE TO BE USED FOR

25   TRANSPLANTATION IN HUNDREDS OF CASES, THE RISK TO PUBLIC

1    HEALTH CAUSED BY THE INSTANT OFFENSE, AND THE NEED TO

2    DETER OTHERS FROM SIMILAR CRIMINAL CONDUCT IN THIS

3    INDUSTRY.

4              UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT

5    SHALL BE PLACED ON SUPERVISED RELEASE FOR A TERM OF THREE

6    YEARS.  THIS CONSISTS OF A TERM OF THREE YEARS ON COUNTS

7    1, 2 AND 3 TO RUN CONCURRENTLY.

8              WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF

9    THE BUREAU OF PRISONS, THE DEFENDANT SHALL REPORT IN

10   PERSON TO THE PROBATION OFFICE IN THE DISTRICT TO WHICH

11   HE IS RELEASED.

12             WHILE ON SUPERVISED RELEASE, HE SHALL NOT

13   COMMIT ANOTHER FEDERAL, STATE OR LOCAL CRIME, AND SHALL

14   NOT ILLEGALLY POSSESS A CONTROLLED SUBSTANCE.  HE SHALL

15   NOT POSSESS A FIREARM OR DESTRUCTIVE DEVICE.

16             HE SHALL COMPLY WITH THE STANDARD CONDITIONS

17   THAT HAVE BEEN ADOPTED BY THE COURT, AND THE FOLLOWING

18   ADDITIONAL CONDITIONS.  HE SHALL CONSENT TO A WARRANTLESS

19   SEARCH BY THE U.S. PROBATION OFFICER OR AT THE REQUEST OF

20   THE PROBATION OFFICER, ANY OTHER OTHER LAW ENFORCEMENT

21   OFFICER OF HIS PERSON AND PREMISES, INCLUDING ANY

22   VEHICLE, TO DETERMINE COMPLIANCE WITH THE CONDITIONS OF

23   THIS JUDGMENT.

24             HE SHALL COOPERATE IN THE COLLECTION OF DNA AS

25   DIRECTED BY THE PROBATION OFFICER.  HE SHALL NOT BE

 1    EMPLOYED IN THE TISSUE RECOVERY BUSINESS DURING THE

 2    PERIOD OF SUPERVISED RELEASE.

 3             THE DEFENDANT SHALL PUBLIC SUBMIT TO A

 4    URINALYSIS TEST WITHIN 15 DAYS OF RELEASE OF IMPRISONMENT

 5    AND AT LEAST TWO PERIODIC URINALYSIS TESTS THEREAFTER AS

 6    DIRECTD BY THE PROBATION OFFICER PURSUANT TO 18 U.S.C.

 7    SECTION 3608.

 8             IT IS FURTHER ORDERED THAT THE DEFENDANT MAKE

 9    RESTITUTION IN THE AMOUNT OF $103,967.95 AS SET FORTH IN

10    THE ATTACHED ORDER.  PAYMENT OF RESTITUTION SHALL BE DUE

11    AND PAYABLE IN FULL IMMEDIATELY.

12             HOWEVER, IF THE DEFENDANT IS UNABLE TO PAY IN

13    FULL IMMEDIATELY, THE SPECIAL ASSESSMENT AND RESTITUTION

14    MAY BE PAID THROUGH THE INMATE FINANCIAL RESPONSIBILITY

15    PROGRAM.

16             THE COURT, HAVING CONSIDERED THE DEFENDANT'S

17    FINANCIAL RESOURCES AND ABILITY TO PAY, ORDERS THAT ANY

18    BALANCE STILL OWED AT THE TIME OF RELEASE SHALL BE PAID

19    IN INSTALLMENTS OF $250 A MONTH TO BEGIN 60 DAYS AFTER

20    HIS RELEASE FROM IMPRISONMENT.

21             AT THE TIME OF THE DEFENDANT'S RELEASE, THE

22    PROBATION OFFICER SHALL TAKE INTO CONSIDERATION THE

23    DEFENDANT'S ABILITY TO PAY THE RESTITUTION ORDERED AND

24    SHALL NOTIFY THE COURT OF ANY NEEDED MODIFICATION OF

25    PAYMENT SCHEDULE.

1          THE COURT FINDS THE DEFENDANT DOES NOT HAVE

2    ABILITY TO PAY A FINE IN ADDITION TO THE RESTITUTION, SO

3    NONE IS IMPOSED.

4          MR. BOYCE, WOULD YOUR CLIENT LIKE TO REPORT AT

5    HIS OWN EXPENSE?

6          MR. BOYCE:  YES, YOUR HONOR, HE WOULD MAKE

7    THAT REQUEST.

8          MR. COWLEY:  YOUR HONOR, WE WOULD OBJECT AND

9    ASK THAT HE BE REMANDED INTO CUSTODY TODAY, YOUR HONOR.

10          THE COURT:  WHAT BASIS?

11          MR. COWLEY:  I THINK HE IS A SERIOUS FLIGHT

12    RISK, YOUR HONOR.

13          MR. BOYCE:  YOUR HONOR, MY CLIENT WOULD LIKE

14    TO BE HEARD ON THAT ISSUE.

15          THE COURT:  OKAY.  I WOULD BE GLAD TO HEAR

16    YOU.

17          THE DEFENDANT:  YOUR HONOR, I AM -- I AM NOT

18    GOING TO BE A FLIGHT RISK.  I HAVE ALREADY LOST

19    EVERYTHING BECAUSE OF THE SENTENCE.  I DON'T WANT TO LOSE

20    ANY MORE.  AND TO BE ABLE TO SEE MY KIDS ONE MORE TIME

21    JUST TO TELL THEM THE TRUTH AND MAKE SURE THAT THINGS

22    THAT NEED TO BE TAKEN CARE OF ARE TAKEN CARE OF.  I AM

23    NOT GOING ANYWHERE.

24          MR. BOYCE:  YOUR HONOR, I WOULD ALSO ASSERT TO

25    THE COURT HE HAS ISSUES THAT I RAISED DURING THE HEARING

1  ABOUT HIS TRANSITION OF THE BUSINESS AND OTHER

2  OBLIGATIONS, GETTING RID OF HIS APARTMENT, TRYING TO MAKE

3  SURE THAT HIS CHILDREN ARE TAKEN CARE OF, AND RESOLVING

4  BUSINESS ISSUES SO HOPEFULLY SOMEBODY ELSE CAN RUN IT.

5        YOUR HONOR, HE HAS COMPLIED WITH ALL

6  CONDITIONS OF RELEASE AND HE HAS KNOWN ABOUT THIS CASE

7  FOR TWO YEARS NOW.

8        THE COURT:  MR. COWLEY, CAN YOU SHOW ME SOME

9  REASON WHY YOU HAVE PARTICULAR REASON TO BELIEVE THAT THE

10 DEFENDANT IS MORE OF A FLIGHT RISK THAN HE HAS BEEN AT

11 ANY TIME?  HE HAS LIVED UP TO HIS REPORTING CONDITIONS

12 UNDER THIS RELEASE ORDER.

13       MR. COWLEY:  YOUR HONOR, WHEN THE DEFENDANT

14 WALKED INTO COURT TODAY, THE SENTENCING MEMORANDUM THAT

15 HAD BEEN SUBMITTED BY HIS DEFENSE COUNSEL WAS ASKING FOR

16 A DOWNWARD VARIANCE, WITH POSSIBILITY OF VERY SMALL

17 AMOUNT OF ACTIVE PRISON TIME.

18       WE ARE IN AN ENTIRELY DIFFERENT BALL GAME NOW.

19 NOT ONLY HAS THE COURT DENIED HIS OBJECTIONS, BUT ALSO

20 GRANTED AN UPWARD VARIANCE AND UPWARD DEPARTURE.

21 NINETY-SIX MONTHS IMPRISONMENT IS A SUBSTANTIAL TERM,

22 YOUR HONOR.

23       I THINK THAT CREATES A VERY STRONG INCENTIVE

24 TO FLEE.  AND WHILE MR. GUYETT REPRESENTS TO THE COURT

25 TODAY THAT HE IS NOT A FLIGHT RISK, YOUR HONOR, WE ARE

1    HERE TODAY BECAUSE MR. GUYETT WAS TELLING LIES.

2              I WOULD SUBMIT THAT HIS CREDIBILITY ON THE

3    STAND TODAY LEFT A LOT TO BE DESIRED.  I DON'T THINK HE

4    CAN BE TRUSTED.  I THINK THAT THERE IS A SUBSTANTIAL

5    FLIGHT RISK, AND I WOULD ASK THAT HE BE REMANDED TODAY

6    FOR THOSE REASONS, SIR.

7              MY UNDERSTANDING IS UNDER THE STATUTE I THINK

8    THERE IS A PRESUMPTION THAT AT THIS STAGE OF THE

9    PROCEEDINGS HE SHOULD BE TAKEN INTO CUSTODY.

10             MR. BOYCE:  BUT IT IS A REBUTTABLE

11   PRESUMPTION, YOUR HONOR.

12             THE COURT:  OKAY.  HAVE A SEAT.  WELL, THIS

13   COURT TRADITIONALLY ALLOWS PEOPLE TO REPORT AT THEIR OWN

14   EXPENSE UNLESS THERE IS A COMPELLING REASON NOT TO, AND

15   THE COURT DOES IT NOT OUT OF ANY CONCERN FOR AN

16   INDIVIDUAL PERSON, BUT FOR TWO MAIN REASONS.

17             ONE IS THAT IT SAVES THE UNITED STATES, THE

18   GOVERNMENT, AND THE MARSHAL SERVICE A LOT OF MONEY IN

19   TRANSPORTING THE DEFENDANT TO A PARTICULAR INSTITUTION.

20   BUT THE USUAL SENTENCE, THE WAY I PRONOUNCE IT IS THAT

21   THE DEFENDANT HAS TO REPORT TO THE INSTITUTION DESIGNATED

22   BY THE UNITED STATES OF BUREAU OF PRISONS ON A DATE

23   DESIGNATED BY THE UNITED STATES MARSHAL, AND THAT PRISON

24   MAY BE IN PENNSYLVANIA, AND IF THE DEFENDANT LIVES IN

25   CALIFORNIA, THE DEFENDANT HAS TO TRAVEL THERE AT HIS OWN

1   EXPENSE, AND UNCLE SAM IS NOT PAYING FOR HIS TRAVEL.  HE

2   IS DOING IT HIMSELF.

3            AND THE DEFENDANT GETS THE BENEFIT OF IT IN

4   NOT HAVING TO RIDE ON THE PRISON BUS ACROSS THE COUNTRY

5   FROM JAIL TO JAIL UNTIL HE GETS TO WHERE HE IS GOING.

6            THERE ARE, OF COURSE, FACTORS THE COURT NEEDS

7   TO TAKE INTO CONSIDERATION AT A TIME LIKE THIS, AND MR.

8   COWLEY HAS CERTAINLY POINTED OUT ONE VERY IMPORTANT

9   ASPECT, AND THAT IS THE LENGTH OF THE SENTENCE, AND I

10  MUST SAY THE DEFENDANT'S LACK OF CREDIBILITY ON THE STAND

11  TODAY.  I SHARE THAT AS WELL.

12           BUT THE MOST IMPORTANT ASPECT TO ME IS ONE

13  THAT HASN'T BEEN MENTIONED AT ALL, AND THAT IS THAT I

14  HAVE SOME CONCERN MYSELF ABOUT THE DEFENDANT'S SAFETY FOR

15  HIMSELF FROM HIMSELF.

16           MR. MARSHAL, HE IS IN YOUR CUSTODY.

17           (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED.)

18

19

20

21

22

23

24

25

1

2

3

4                                CERTIFICATE

5

6              THIS IS TO CERTIFY THAT THE FOREGOING

7    TRANSCRIPT OF PROCEEDINGS TAKEN IN THE UNITED STATES

8    DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

9    THE SHORTHAND NOTES, CONSISTING OF THE WHOLE THEREOF, OF

10   THE PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

11   TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

12              DATED THIS 6TH DAY OF JANUARY, 2010.

13

14

15

16

17                              /S/ SHARON K. KROEGER
                                COURT REPORTER
18

19

20

21

22

23

24

25